SARAH BOONE AND OTHERS, APPELLANTS v. WILLIAM CHILES
AND OTHERS, APPELLEES.

The complainants filed a bill in the circuit court of Kentucky, claiming a conveyance of the legal title, and an account of rents and profits of a tract of land, the legal title to which was derived, in virtue of the law of Virginia, under a settlement and a pre-emption right, held by Reuben Searcy. Searcy gave his bond to Hoy, to make a deed of one-half of the land to which he was thus entitled; the other half having been given by him to one Martin, to obtain the location and patenting. He afterwards gave the plats and surveys to Hoy, who, in 1785, obtained a patent for the land, which he was to have a deed for. Hoy, in 1781, assigned the bond of Searcy to George Boone, and made himself surety for its performance; and George Boone assigned the bond to Thomas Boone, the ancestor of the complainants. Thomas Boone lived in the state of Pennsylvania, and was in Kentucky in 1802, 1810, and 1819, in the neighborhood of the land; but while there he took no measures, personally, to obtain the title or possession of it. In 1787 he gave to George Boone a power of attorney to obtain a conveyance of the land; and in 1802 he made a conditional sale of it to Hezekiah Boone; but the condition was not performed by Hezekiah Boone; so that under the agreement he obtained no right to the land. Possession was taken of parts of the land, and improvements made as early as or before 1806, and the persons in possession are among the defendants. George Boone exceeded his powers, and made agreements to sell the land; and also agreed to give up to one of the heirs of Hoy, Searcy's bond; and some of the heirs sold parts of the land to the persons in possession, asserting a right to the legal title: and another of the heirs sold by a quit-claim deed all her rights, as one of the heirs of Hoy, to Green Clay. Afterwards William Chiles, alleging that he had obtained from George Boone, and from Hezekiah Boone, the conditional purchaser, the equitable right of Thomas Boone, under Searcy's bond; filed in the name of Thomas, George, and Hezekiah Boone, and in his own name, in the county court of Bourbon county, a bill against the heirs of Hoy, the persons in possession, and against Green Clay, alleging him to be a purchaser with notice of Thomas Boone's equitable title, under Searcy and Hoy: and obtained from that court a decree for a conveyance to him of the legal title, and afterwards a deed for the same from a commissioner appointed to execute the same. This decree was afterwards, on appeal, reversed for informality; but before the same was reversed, the complainants filed this bill, asking for a conveyance from Chiles of all the title he held in the land, either under the decree, or in any other manner. Chiles, after the bill was filed, purchased from Green Clay the rights he held; and, in his answer, alleges him to have been an innocent purchaser, without notice. The persons in possession, who purchased from Chiles, after the decree of the Bourbon court, answered, asserting their possession, and that they were protected by the statute of limitation; and submit to such rules and regulations, according to law and equity, as the case may require. In 1822, Thomas Boone made an agreement with Boone Engles, by which the latter took upon him the institution and conducting of this suit, for a portion of the benefit to be derived from it; and this the persons in possession

allege to be champerty. The court decreed a conveyance by Chiles, and by others who held the legal title, to be made to the complainants, of all the lands unsold, and not in the possession of others; and that those who are in possession, who had purchased from Chiles, should pay to the complainants the sums which they agreed to pay, respectively, with interest, according to their respective contracts.

A court of equity must be regardless of all its rules, before it can recognise Chiles as a purchaser, or as having any right whatever in the land : it must also forfeit its character, if it sanctions such a course of iniquitous fraud. We deem it wholly useless to contrast the relative equities of the plaintiffs and Chiles, in order to affirm their right to a decree for the conveyance of the legal title, obtained in violation of every principle which governs courts of equity ; unless he has made out some objections to the relief prayed, on grounds unconnected with the justice of the case.

The heirs of Searcy are not parties: they had no interest in the land ; their father's bond was satisfied by the performance of the condition, when the patents were obtained by Hoy ; who, by purchase from Martin and Searcy, held the legal title to the whole fourteen hundred acres, subject to be divested only by the equity of Boone, derived by this agreement to transfer the one-half. No act, therefore, remained to be performed by the heirs of Searcy. The title of Boone becomes complete, by the union of his equitable with Hoy's legal title, without any interposition of the heirs of Searcy, who have no interest to defend, or title to convey.

The lapse of time and the staleness of the plaintiffs' equity, is also set up as a bar to a decree in their favor : but whatever effect time may have in equity in favor of a possession long and peaceably held; it can have none in favor of Chiles, whose only claim is under the equity of Thomas Boone, and against whom the present suit was brought in six years after he first interfered with it. It cannot be permitted to him to acquire the legal title of Hoy, in virtue of Boone's equity, and to hold it to his own use; on the ground that Boone's right had become extinct by the lapse of time, before he acquired it. The means by which the legal title has been conveyed to Chiles, have affected his conscience too deeply with fraud, for a court of equity to suffer him to enjoy its fruits. As to him, the plaintiffs have established a right to a decree for the conveyance of whatever title he may have derived by any conveyance to himself directly, of the legal right of Hoy's heirs.

By the rules of an appellate court, it can act on no evidence which was not before the court below, or receive any paper that was not used at the hearing.

A party is not allowed to state one case in a bill or answer, and make out a different one by proof: the *allegata* and *probata* must agree ; the latter must support the former.

A purchaser with notice may protect himself under a purchaser by deed without notice; but cannot do it by purchase from one who holds or claims by contract only. The cases are wholly distinct. In the former, the purchaser with notice is protected ; in the latter, he has no standing in equity, for an obvious reason ; that the plaintiffs' elder equity shall prevail, unless the defendant can shelter himself under the legal title acquired by one whose conscience was not affected with fraud or notice, and who can impart his immunity to a guilty purchaser, as the representative of his legal rights fairly acquired by deed, in such a manner as exempts him from the jurisdiction of a court of equity. Such a purchase affixes no stain on the conscience, and equity cannot disturb the legal title. But as it does not pass by a contract of purchase without deed, the defendant can acquire only an equity ; the transfer of which does not absolve him from the consequences of his first fraudulent purchase. His second purchase of an equity will not avail him more than the first ;

for the original notice of the plaintiff's equity taints his conscience, so as to make him a mere trustee, if he holds the legal title from one who is not an innocent, bona fide purchaser.

It is a general principle in courts of equity, that, where both parties claim by an equitable title, the one who is prior in time is deemed the better in right; and that where the equities are equal in point of merit, the law prevails.

Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser, who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it: and when, in addition, he shows a legal title from one seised and possessed of the property purchased, he has a right to demand protection and relief, which a court of equity imparts liberally. Such suitors are its most especial favorites. It will not inquire how he may have obtained a statute, mortgage, encumbrance, or even a satisfied legal term, by which he can defend himself at law, if outstanding: equity will not aid his adversary in taking from him the *tabula in nonfragio*, if acquired before a decree. Relief will not be granted against him in favor of the widow or orphan; nor shall the heir see the title-papers. It is a bar to a bill to perpetuate testimony, or for discovery ; and goes to the jurisdiction of the court over him : his conscience being clear, any adversary must be left to his remedy at law.

But this will not be done on mere averment, or allegation ; the protection of such bona fide purchase, is necessary only when the plaintiff has a prior equity ; which can be barred or avoided only by the union of the legal title with an equity, arising from the payment of the money, and receiving the conveyance without notice, and a clear conscience.

In setting it up, a bona fide purchase without notice, by plea or answer, it must state the deed of purchase, the date, parties, and contents briefly ; that the vendor was seized in fee, and in possession : the consideration must be stated, with a distinct averment that it was bona fide and truly paid, independently of the recital in the deed. Notice must be denied previous to, and down to the time of paying the money, and the delivery of the deed ; and if notice is specially charged, the denial must be of all circumstances referred to, from which notice can be inferred ; and the answer or plea must show how the grantor acquired title. The title purchased must be, apparently, perfect, good at law, a vested estate in fee simple. It must be a regular conveyance ; for the purchaser of an equitable title holds it subject to the equities upon it in the hands of the vendor, and has no better standing in a court of equity. Such is the case which must be stated to give the defendant the benefit of an answer or plea of an innocent purchase without notice ; the case stated must be made out ; evidence will not be permitted to be given of any other matter not set out.

The objections to the plaintiffs' recovery on the ground of the contract between Thomas Boone and Boon Engles being within the statutes of champerty and maintenance, cannot be sustained for two reasons : 1. The English statutes on this subject, which were adopted in Kentucky, punished the offence and declared the contract for maintenance void between the parties, but did not direct or authorize the dismissal of the suit instituted between other parties in furtherance of such contract. Boon Engles is no party to this suit; and it does not concern the defendants whether it was commenced and is conducted by his agency, or by the plaintiffs themselves : the right of plaintiffs is not forfeited by such an agreement, and it may be asserted against the defendants whether the contract with Boon Engles is valid or void. 2. By the act of Kentucky of 1798, which was in force when this contract was made, and suit brought; no person could be prevented from prosecuting or defending any claim

to land held under the land laws of Virginia; nor was any suit brought to make good such claim considered as coming within the provisions of the common law, or any statute against champerty or maintenance. These statutes were not revived till 1824.

The time does not bar a direct trust as between trustees and cestui que trust, till it is disavowed: yet, where a constructive trust is made out in equity, time protects the trustee, though his conduct was originally fraudulent, and his purchase would have been repudiated for fraud. So, where a party takes possession in his own right, and was prima facie the owner, and is turned into a trustee by matter of evidence merely. And where one intending to purchase the entire interest in the land, took a conveyance without words of limitation to his heirs, passing only as an estate for life, the lapse of fourteen years after the expiration of the life estate, was a protection to the heirs of the purchaser.

What that reasonable time is, within which a constructive trust can be enforced, depends on the circumstances of the case; but there can be few cases where it ban be done, after twenty years' peaceable possession, by the person who claims in his own right, but whose acts have made him a trustee by implication. His possession entitles him to at least the same protection as that of a direct trustee, who, to the plaintiffs' knowledge, disavows the trust, and holds adversely; as to whom the time runs from the disavowal, because his possession is thenceforth adverse. The possession of land is notice of a claim to it by the possessor; if not taken and held by contract or purchase, it is, from its inception, adverse to all the world; and in twenty years, bars the owners in law and in equity. A purchaser in possession by a contract to sell, is in law a trespasser; but in equity, he is the owner of the estate, having taken possession under the contract; and the vendor is in the situation of an equitable mortgagor. If the entry was by purchase, and the purchaser claims the land in fee, he is not a trustee; his title, though derivative from, and consistent with, the original title of the plaintiffs, is a present claim in exclusion of, and, adverse to it. A vendee in fee, derives his title from the vendor; but his title, though derivative, is adverse to that of the vendor: he enters and holds for himself. Such was the doctrine of this court in Blight's lessee v. Rochester, 4 Pet. 506, 7. In that case the court said, "The vendee acquires the property for himself, and his faith is not pledged to maintain the title of the vendor."

Equity makes the vendor without deed, a trustee to the vendee, for the conveyance of the title; the vendee is a trustee for the payment of the purchase money, and the performance of the terms of the purchase. But a vendee is in no case a trustee of the vendor, as to the possession of the property sold; the vendee claims and holds it in his own right, for his own benefit, subject to no right of the vendor, save the terms which the contract imposes; his possession is, therefore, adverse as to the property, but friendly as to the performance of the conditions of the purchase.

APPEAL from the circuit court of the United States for the district of Kentucky.

The principal facts of this case were the following: Reuben Searcy being entitled to a settlement of four hundred acres of land, and a pre-emption of one thousand acres, in Bourbon county, Kentucky, under the laws of Virginia; obtained a cer-

tificate thereof from the commissioners, and he employed one John Martin to perfect the title to the lands, and gave him one-half of the same for so doing. On the 24th September 1781, Searcy sold seven hundred acres, supposed to be one-half of the land, to William Hoy, and executed a bond to Hoy. The bond was in the following words :

" Know all men by these presents, that I, Reuben Searcy, of the county of Fayette, am held and firmly bound unto William Hoy, of the county of Lincoln, and state of Virginia, in the penal sum of fifty thousand pounds, current money of Virginia, to which payment, well and truly to be made, I bind myself, my heirs, executors, and administrators, unto the said William Hoy, he, his heirs, or assigns, this 24th day of September 1781. The condition of the above is such, that if the above-bound Reuben Searcy shall well and truly make, or cause to be made, as soon as deeds are made to lands in this county in general, a good and sufficient deed for seven hundred acres of first-rate land, lying in Fayette county, on Licking creek, between John Martin's station and Ruddle's station ; it being part of a settlement and pre-emption, that John Martin cleared out on the halves for said Reuben Searcy ; and the said Hoy takes his first choice of the land ; then the above obligation to be void ; otherwise to remain and be in full force and virtue."

On the 15th of December 1781 William Hoy made the following assignment to George Boone of this bond, by an endorsement thereon :

" I, William Hoy, assign over the within bond unto George Boone, his heirs, or assigns ; and said Hoy obliges himself, his heirs, executors, and administrators, as *shourety* to within bond ; and if the within lands cannot be obtained by reason of a prior claim, then, and in that case, seven hundred acres, equal in quality and convenience, shall discharge the within bond."

Searcy also assigned the plats and certificates of survey to Hoy, who was thus enabled, in July 1785, to complete the title, by obtaining patents for the land in his own name. On the 30th of April 1785, George Boone made the following assignment of the bond to Thomas Boone, the ancestor of the appellants, who are his heirs :

[Boone v. Chiles.]

" I do hereby assign over all my right, title, and claim of the within bond unto Thomas Boone, heirs, or assigns, without recourse to the same ; that is to say, that I, the said George Boone, am no ways obligated, if the said William Hoy, or his heirs, sufficient to make good the within bond ; but if the said William Hoy, or his heirs, should not be good, then I, George Boone, do bind myself, my heirs, to make good the same unto the said Thomas Boone, or his heirs or assigns."

On the 25th day of January 1823, Thomas Boone filed a bill in the circuit court of the United States for the district of Kentucky, stating his equitable right, thus derived, to seven hundred acres of land, part of the settlement and pre-emption of Searcy, alleging that he had never parted with the same ; but admitting that he made a conditional contract with Hezekiah Boone for it, which was never complied with by said Hezekiah, and was afterwards expressly abandoned by him.

On the 1st of 'October 1787, Thomas Boone, who resided in the state of Pennsylvania, gave to George Boone a power of attorney, in the following terms :

" Know all men by these presents, that I, Thomas Boone, of Oly township, in the county of Berks, and commonwealth of Pennsylvania, blacksmith, for divers good causes, me hereunto moving, hath constituted and appointed, and by these presents do constitute and appoint my trusty friend, George Boone, of Madison county, in the settlement of Kentucky, and commonwealth of Virginia, yeoman, my true and lawful attorney, for me and in my name, and to my use, to ask, demand, sue for and recover of and from Major William Hoy, of Kentucky settlement, a deed or other lawful conveyance, valid in law, for seven hundred acres of land, in or near the waters of Hinkson and Stoner, branches of Licking river ; it being one-half or moiety of a settlement and pre-emption right, belonging to a certain Reuben Searcy, and which I purchased from squire Boone, who purchased the same from said George Boone, who purchased the same from said William Hoy, hereby giving and granting my sole power and authority to my said attorney concerning the premises, to do or cause to be done therein, as amply as I myself might or could do were I personally present ; and on the obtaining said title and

conveyance for me, and in my name, sufficient discharges to sign, seal, and deliver, and one or more attorney or attorneys under him, to substitute and appoint, and at pleasure to revoke, hereby ratifying and confirming whatsoever my said attorney shall lawfully do concerning the premises. In witness whereof, I have hereunto set my hand and seal, this 1st day of October 1787."

The bill charges that William Chiles instituted a suit in the Bourbon circuit court of Kentucky, without the knowledge or consent of Thomas Boone, in the name of Thomas Boone, William Chiles, Hezekiah and George Boone, against the heirs of William Hoy, and against others in possession of the land, to compel the execution of a conveyance of the seven hundred acres of land: that in the suit, Chiles, alleging the execution of the bond by Searcy, and the assignments before stated, pretended that, under the conditional contract between Thomas and Hezekiah Boone, the latter had become entitled to the land, and that he had purchased it from said Hezekiah. In the suit, a decree was pronounced for a conveyance to be made to Chiles; and on the 7th day of January 1822, a commissioner, appointed by the court, according to the laws of Kentucky, executed a conveyance to Chiles for seven hundred acres of the land, in conformity with the decree.

In the proceedings in the Bourbon court, William Chiles made Green Clay a defendant, alleging him to be a purchaser from Newland and wife, of two-eighths of the land, he having notice of Thomas Boone's rights. The wife of Newland was one of Hoy's heirs. After the decree, he purchased from Green Clay all he held under Newland and wife; and, in this case, he relies on the title obtained under that purchase.

Hezekiah Boone, by his answer, asserts a right to the land under the conditional contract, but no proof of a compliance with the same was given in the cause; and it was in evidence that, long after the contract, he acknowledged he had no right to the land, and that it belonged to Thomas Boone.

Some of the defendants, in the circuit court, allege that George Boone, as attorney in fact for Thomas Boone, in August 1792, assigned Searcy's bond to a certain John South, and delivered the bond to him. John South was the executor of William Hoy,

and had married one of his daughters ; and South sold, to some of the defendants, parts of the land, under a pretence that he held Hoy's claim : and they insist that the assignment of Searcy's bond shall enure to their benefit.

It was in evidence that William Chiles, after the death of John South, applied to Benjamin South, who had the custody of Searcy's bond, and by an arrangement with him, the assignment to John South was erased and cancelled, and the bond was transferred to Chiles. This was prior to the institution of the suit in the Bourbon county court, and the bond was filed among the proceedings in the cause.

The defendants also set up, by way of defence, that an agreement in writing, of which a copy is filed, was made between Thomas Boone and Boon Engles, in December 1822, by which Engles undertook, at his own expense, to prosecute a suit for the 700 acres of land in dispute ; and, as a consideration for his trouble, &c., was to have one-half of the land. This suit, they allege, is prosecuted under that agreement ; and they charge that it is, therefore, a case of champerty and maintenance, forbidden by law ; and in which the court can give no relief. The complainants rely, that at the time of the agreement, the law of champerty and maintenance was not in force in Kentucky ; and that, if it was, this case does not fall within its scope.

During the pendency of this suit, in the circuit court of Kentucky, the defendants, in the suit in the Bourbon circuit court, instituted, as aforesaid, in the name of Chiles and the Boones, prosecuted a writ of error from the court of appeals of Kentucky, to reverse the decree, obtained in that suit. And the court of appeals accordingly did reverse the decree for want of proper parties ; and remanded the cause to the Bourbon circuit court for further proceedings. The cause is still pending there ; Chiles and the heirs of Thomas Boone respectively claiming a right to direct its future prosecution.

By amended pleadings, the complainants allege the reversal of the decree of the Bourbon county court ; and the heirs of. George Boone were made defendants. They also allege that the heirs of George Boon assert no claim to the land ; and that Searcy is dead, having left no heirs known to the complainants.

[Boone v. Chiles.]

During the proceedings in the circuit court, and in this situation of the same, a question of jurisdiction arose; and the judges being divided in opinion, the cause was adjourned, according to law, to the supreme court, with the following statement of the points respecting which the judges were divided in opinion: 1. " The court being then divided, and the judges opposed in opinion as to the jurisdiction over the case; and, unable, therefore, to render a decree on the merits, they resolve to adjourn that question to the supreme court, to wit, under all circumstances, appearing as above, can this court entertain cognizance of the case? 2. The judges were also opposed in opinion on the point whether the complainants were entitled to a decree in the absence of any proof that the persons made defendants in the amended bill, as heirs of George Boone, were in fact his heirs?"

The cause came on, upon this adjournment of it, before the supreme court, at the January term, 1834; and this court, in its mandate to the Kentucky circuit court, certifies its opinion on the questions submitted to it as follows: " The court is of opinion, 1. That, under the circumstances stated in the certificate of the judges, the said circuit court could entertain cognizance of the case. 2. That the want of proof that the persons made defendants in the amended bill, as the heirs of George Boone, were, in fact, his heirs; is no obstruction to a decree on the merits of the cause."

It appears on the record that William Chiles, besides the conveyance executed to him by the commissioner appointed by the Bourbon circuit court, of the interest of all the heirs of Hoy; obtained a special conveyance, prior to the institution of the Buorbon suit, from William Hoy the son, and his wife, and John Sappington and Parthenia, his wife; who were two of the heirs of William Hoy the obligor.   And in Chiles's bill filed in the circuit court of Bourbon, he charges G. Clay to have obtained the interest of Newland and wife, as one of the heirs of W. Hoy, with full notice of his (Chiles's) claim; in other words, with full notice of the claim of Thomas Boone's heirs: and that he G. Clay, upon receiving a conveyance from them, bound himself by special contract to make good all the contracts of their ancestor.

Green Clay filed his answer to the bill of Chiles and others,

in the Bourbon circuit court; in which answer he does not allege that he has obtained the legal title from Newland and wife; he does not allege that he has obtained any title from them, but refers to a *contract* by which he acquired their interest, and, without producing it, refers to it as being of record.

The heirs of John South, of George Boone, and of Hezekiah Boone, were made defendants, and most of them answered : but the complainants allege they are only formal parties.

One object of the suit is to annul the contract betwen Hezekiah Boone and Thomas Boone ; but the main purpose of it is to obtain the legal title to and possession of the 700 acres of land in contest, which is vested in W. Chiles and the heirs of W. Hoy, and which Chiles, as is alleged, fraudulently acquired; first, by possessing himself of the bond of R. Searcy, the property of Thomas Boone ; and, secondly, by prosecuting the suit in chancery in the Bourbon circuit court, in the name of Thomas Boone and others; and, lastly, by obtaining from two of the heirs of Hoy, and from Green Clay, conveyances.

Upon the returr of the cause to the circuit court, in May 1834, that court pronounced a final decree, by which the defendant, Chiles, was decreed, by deed of release, with special warranty, to convey to the complainant all his title and interest in the land in controversy, except that which he held under a deed from Green Clay, who the court state, was a purchaser for a valuable consideration from Newland and wife, (she being one of the heirs or devisees of W. Hoy, in whom the legal title was;) and who conveyed to Chiles the title which he (Clay) had so acquired. The court also decreed that Chiles should deliver to the clerk of the court, to be cancelled, the contract between him and Hezekiah Boone and George Boone, as attorneys in fact for Thomas Boone, as it appeared to the court that the contract was made without authority, and that its terms had never been complied with by Hezekiah Boone. The court further decreed (having previously caused an adjustment to be made of one-half of the rents and profits of the land, and one-half of the value of the improvements,) the tenants in possession to pay the several balances which appeared to be due from them. As to so much of the land as was claimed by John Evalt, one of the defendants, within the

[Boone v. Chiles.]

bounds of Flournoy's patent, and which is described in the decree ; the court dismised the bill, as Evalt, and those under whom he claims, had more than twenty years adverse possession. The court further decreed that the claim of the complainants is not to be prejudiced by the decree in this cause, as to any of the heirs of Hoy, who are not parties to the suit. The court likewise decreed that Jones Hoy, and Fanny, by her guardian *ad litem*, do convey all their interest, &c. in the land, as heirs or devisees of William Hoy. And, finally, the court directed the clerk, as commissioner, to convey, in default of conveyances being made by the defendants, according to the statute of Kentucky ; and possession to be delivered by a fixed day.

From this decree both parties appealed, and entered into the requisite bonds for the due prosecution of their respective appeals.

The case was argued at January term 1835, by Mr. Clay, for the appellants, and by Mr. Harding, for the appellees; and the court, after advisement, ordered a re-argument. Is was now, again, argued by Mr. Clay and Mr. Crittenden, for the appellants, by Mr. Underwood, for William Chiles, and by Mr. Hardin, for the other defendants.

Before the argument was commenced, Mr. Underwood stated that he was desirous to submit a preliminary question, which was, whether a certain deed from John Newland and wife to Green Clay, a certified copy of which would be filed among the records of the court, would be admitted as part of the proceedings of the case in the circuit court ? If this was refused, he would move for a certiorari to the circuit court, in order to bring up the same.

Mr. Clay stated that the deed had not been exhibited in the circuit court, on the hearing of the case. The final decree of the circuit court, from which this appeal was prosecuted, was returned at May term 1834. The paper now offered purports to be a copy of a deed which the clerk of the circuit court, on the 3d day of June 1835, certifies was produced to the court by the counsel of the defendants ; who " suggested that the same deed was on file." and " used on the hearing of the cause ;" and that on the said

3d day of June 1835, was, by the court, ordered to be copied and certified to the supreme court.

He was willing that the copy of the deed should be considered as if the deed were before the court on a return to a certiorari. As he denied that the deed had been used in the circuit court, he would not admit its use in this court; nor did the certificate of the clerk show that the deed had been before the circuit court, on the hearing of the cause.

It was agreed by the counsel, that the copy of the deed should be considered as if it had been sent up from the circuit court on a certiorari.

Mr. Clay, for the appellants, said that it would be contended the decree of the circuit court was erroneous—

1. In decreeing in behalf of William Chiles, upon the conveyance of Green Clay to him of the interest of Newland and his wife, who was one of the heirs of William Hoy. Neither Green Clay, in his answer to the bill in the Bourbon court, nor Chiles, as his alienee, in his answer in the federal court, makes those allegations which entitle Clay or Chiles to the protection accorded to them, of a bona fide purchaser without notice. There is no allegation or proof as to what sum was paid, or when or how it was paid, by Clay to Newland and wife. He does not deny the allegation of the bill, that he (Clay) purchased under a stipulation to make good the contract of the ancestor of Newland and wife, William Hoy. He does not exhibit any legal title whatever, (and none is believed to exist,) from Newland and wife to him. And there is much reason to believe that his own *quit claim* title to Chiles, was made to avoid the suit which Chiles was prosecuting against him in virtue of the title-papers of Thomas Boone. A purchaser, to be protected, must show that he has paid a fair consideration, and what it was; and obtained the legal title, before he had notice of the equity. Clay and Chiles have utterly failed to establish these indispensable requisites: and Chiles himself, in the Bourbon bill, charged Clay to be a mala fide purchaser.

2. The court below erred in dismissing the bill as to Evalt, and ought to have decreed against him.

3. That the court is also believed to have erred in limiting the

[Boone v. Chiles.]

decree to one-half the amount of the rents and profits.   It ought to have decreed to the complainants the whole amount of the rents and profits upon the land in contest ; or at least a greater proportion thereof than that of one-half.

. He would examine the case—

1. As it respects the heirs of William Hoy.

2. As to the rights and duties of William Chiles.

3. As it respects the rights and claims of the tenants in possession.

·This is the common case of an application to chancery, to oblige the holder of the legal title to convey to the holder of a superior equitable title.

As to Hoy's heirs, the only ground set up for them is the length of time, since the execution of the bond and the transfer of the same.   No one of the parties can present, or did offer a solid objection to the title.

In considering this objection, it will be proper for the court to look at the terms of Searcy's bond, and to those of the assignment.   It is not an agreement to make a conveyance at once ; but " as soon as deeds were made for lands in the country in general." ·

In estimating time on an instrument, it is proper to look to the condition for the period and circumstances in which its obligation is to be performed.   In this case the provision is important, for the state of the country, and the difficulties of conflicting titles created great delays.   The deed was to be made after all these difficulties should cease.   There is, therefore, in the bond, no definite time for the execution of the contract it contains.  But the obligor disqualified himself from executing the contract in the bond ; for he assigned the evidences of title, and the deed was to be made when Martin had perfected the rights of Searcy. William Hoy died shortly afterwards, within four or five years, leaving infant heirs ; some of whom did not arrive at age until 1809.    This suit was commenced fourteen years afterwards. There is evidence on the record to show that the infancy of Hoy's heirs was the cause of the delay.   The evidence proves that South, the executor of William Hoy, postponed the delivery of the title.   It is also contended that the obligor was bound to

[Boone v. Chiles.]

give notice; when he was ready to make the title. He may be hastened by the obligor ; but if the time was vague and indefinite, and depending, as in this case, on circumstances which he only, or he best knew ; he shall not avail himself of the lapse of time, unless he gives notice.

As the patents issued to another, he should have given notice ; and as to the interfering claims within the survey, there are suits to this day; non-residence—application for title—infancy—the acts of South ; all these show that if the dispute was with Hoy's heirs only, this court could, without hesitation, give the relief asked by the appellants. But others are interested in the controversy, who claim under a title derived from some of the heirs of Hoy. The answers of Hoy's heirs show, that they themselves make no claim ; and the appellants are resisted by strangers, claiming for them.

2. As to the condition of William Chiles, and on the question whether there is any thing in his situation, which can authorize him to resist the claims of the appellants :

He claims under the ancestor of the appellants, and under proceedings founded on his right. He was not in possession, and never was in possession : and he instituted the proceedings in the Bourbon county court, obtained a legal title, fraudulently ; and he now refuses to give up that title to the appellants.

A very important question is presented under the commissioner's deed. A fraudulently procures, by proceedings in the right of B, a title to be made to him, founded on that right, and obtains a conveyance in his own name. By the laws of Kentucky, no title can be derived but by deed or last will. A deed under the decree of a court is not the end of a suit, but it is the means to obtain a title. At the time when, by the decree of the Bourbon court, Chiles obtained the conveyance, the proceedings of the appellants in the circuit court of the United States were instituted. The decree of the Bourbon court was afterwards reversed, and the question is, whether proceedings of another court subsequent to the institution of this suit, and when Chiles held a title under the decree of that court, could affect, or in any manner impair or alter the jurisdiction of this court over the case as it stood, when the proceedings were commenced ? The proceed-

[Boone v. Chiles.]

ings of the inferior court need not be looked into. The title under the decree remains in Chiles, and will so remain until divested by a deed or last will. It can thus be regarded by this court; and a conveyance of his title, under the order of the court, will give a title to the complainants. This view of the case is sustained by analogies in the law. Sales of personal property under the decree of a court, afterwards reversed, are valid; and even a purchase made by a complainant under a decree in his own case, subsequently revoked, will stand. Whatever is done by a competent court, while its decrees are in force, is binding on the whole world. The court may, in its discretion, order differently. The Bourbon court did not know the fraud of Chiles on the complainants. It had no application before them for a reconveyance, on which an order for the same could be made.

But if, by any proceedings subsequent to the conveyance to Chiles, under the decree of the Bourbon court, the operation of the same has been impaired or affected; yet this court should order that all the title held by Chiles should be conveyed to the complainants.

It is contended by him that, independent of the right which Chiles derived under the proceedings of the Bourbon court, he has one-eighth part of the land purchased from Newland and wife by Green Clay, and conveyed by him to Chiles. The wife of Newland was one of the children of William Hoy.

The conveyance of Newland and wife to Green Clay was only by a quit claim deed; and there is no evidence of his having paid any thing for it. Chiles, in the proceedings in the Bourbon court makes Green Clay a defendant, and charges him as a purchaser with notice. Neither Clay or Newland assert that a deed was made, but only a contract. No possession was delivered, and no money was paid. Newland and wife say they never conveyed a title by deed to Clay.

For the first time, a deed to Clay is produced as if sent up under a certiorari to the circuit court. The counsel of Chiles, after the appeal to this court, went into the circuit court and suggested that the deed had been produced on the hearing of the cause; and he now asks that it shall be considered by this court. It is

for this court to decide what effect shall be given to it. Its admission to any consideration, is opposed.

The only paper regularly in the record is a quit claim deed, to Chiles, and this made after the suit was commenced. Chiles asserts that this gives him a right to one-eighth under Green Clay as an innocent purchaser without notice. If Green Clay was an innocent purchaser, Chiles was not so. He well knew the superior equity of the complainants, and he can have no benefit from Green Clay's title, if he had any ; as he is, in reference to that title, a volunteer, with full notice.

3. As to the claims of the tenants, or those who are in possession of the land.

They, like Chiles, hold under the complainants, and must take their fate with Chiles.

They purchased from South, who stated that he claimed under the bond of Searcy, and this was sufficient to put them on the inquiry as to the real owner of the land. All the tenants, from 1718, hold under Chiles, having purchased from him. They therefore have acknowledged the right of the complainants ; but, as Chiles could not convey their right, they cannot avail themselves of the purchase from him. Cited 2 Bibb's Reports, 506.

By the purchase from Chiles, they held a title consonant to that of the defendants. No adverse title can be so acquired. They never were in possession, adversary to the possession of the appellants. What, in Kentucky, according to the decisions of the courts of that state, is an adversary possession ? Holding under a different or opposing title adversely ; not when both hold under the same title. This principle brings the purchasers from South under the title of the heirs of Hoy, which is not adverse. 4 Bibb. Rep.; 3 Littel. Rep. 134, 20 ; 5 Littel. 316 ; 6 Littel. 444. In two of the cases cited Chiles was a party.

In the record of the case, there appears a recovery from the tenants by Chiles, under the title of Hoy's heirs. The appellents have a conveyance from Mrs. South, who was one of the heirs of Hoy. The sale by her husband could give no title.

In reference to the allegation of champerty, which is made from the connextion of Boon Engles with the case, it is urged that at the time of the agreement between Engles and Boone,

[Boone v. Chiles.]

there was no law against champerty in Kentucky. The law against champerty was repealed in 1798, and was not renewed until 1824.

This is a contest between two equities; and the complainants have the elder, and are justly entitled to a preference. They have five-eighths of the land, besides Newland's one-eighth; and yet the decree gives them but four-eighths. They are also entitled to a proportionate decree for the rents and profits.

Mr. Underwood for William Chiles.

The bond of Searcy stipulates that a title shall be made, and this has been done, and the obligation has been complied with; and yet a bill in chancery is filed to have a title made. The complainants ask to have done what is already done.

The obligation of the bond was completed, by the issuing of the patents to Hoy. All he was to obtain was delivered to him, and there is then no foundation for this proceeding. If there could be a claim for a deed with warranty, even this is satisfied by the patents.

The bill does not charge fraud in Searcy, by assigning the plat and certificates, so that they could get the title; and Searcy or his heirs, are not made parties to this proceeding; and yet a specific execution of Searcy's contract is asked. This is an objection to the proceedings.

The assignee Boone has no right to complain of the assignment of the title to Hoy, unless he proves that Searcy had no notice of his right to receive it.

By the assignment of the bond to Boone by Hoy, he undertook nothing but as a surety; and there is no remedy against a surety under the laws of Kentucky, until after the principal has been prosecuted to insolvency; which has not been done.

Nor does the bond furnish a sufficient description of the land, so that a specific performance can be asked from a court of equity. No decree can be given for a conveyance of any particular part of the land. The bond is for seven hundred acres; the survey includes two thousand acres; and the appellants ask one-half of that quantity. Out of what part of the survey, is the seven hundred acres to be taken? They can have but seven hundred acres. Hoy

is to have the first choice; but he must have made it, and specially designated the part chosen, before a bill in equity for any part of the land could be filed. It is now too late to make the election as to a particular part. Forty or fifty years have elapsed. The lapse of time has barred all remedy on the bond, if it ever existed.

The courts of Kentucky allow a bill for a specific execution of a contract to be filed in favor of possession after twenty years; but in no case do they permit the proceeding when twenty years have passed, and there has been no possession. 1 Dana 236. To escape from this rule, it is attempted to show that the cause of action has originated within twenty years.

The construction of the bond, which is claimed by the appellants, is denied. The title was to be made within a short period; and the assertion that the history of the country shows the title, could not have been made soon after the date of the bond, is contradicted by the fact that the patents for the land were soon obtained. The terms of the bond have reference to the granting of the patents. The longest indulgence given by the laws of the state expired in 1798. If the time could be extended to 1800, this suit was not brought until twenty-three years after; and there is nothing which, satisfactorily, accounts for the delay.

Searcy, or his heirs, and Hoy, or his heirs, should have been made parties. The rule in Kentucky is, that all parties, who have an interest, should be before the court, for the settlement of all the matters. This has not been done, and the proceedings are irregular.

There is another principle which has a strong influence in this case, and which is the established law in Kentucky. When this bond was given, it was not assignable. The statute making it assignable, passed long after it was made. The courts of Kentucky have decided, that where you proceed on an instrument assigned before the statute, you must bring in all the heirs, and all others interested.

Another objection to the complainants' success, arises from the survey containing two thousand acres, under the pre-emption and settlement rights, of which Martin has one-half; and yet Chiles is to part with all his interest in favor of those who can recover no more than seven hundred acres. Who is entitled to

the surplus of the seven hundred acres, which will remain out of the one-half of the two thousand acres? Chiles is to be deprived of all but that he holds under Green Clay; which he should hold. The complainants can have a right to no more than seven hundred acres, and they can recover no more. Three hundred acres remain, and they belong to Chiles and to Hoy's heirs.

Adversary claims exist to parts of the lands, and the adverse claimants are in possession. This is an objection to a selection being made. All the interfering claims cannot be thrown on the half belonging to Martin. No selection can now be made.

As to the deed executed by Newland and wife: it is here as if on a certiorari, and it appears to have been certified by order of the circuit court. The principle has been well settled in the court of appeals of Kentucky, allowing inferior courts to amend the record, and certify the papers which were used in the case. The deed is to be regarded as a deed on the record.

As to the answer of Newland and wife, which is referred to in order to diminish the effect of this deed, it can have no influence against the regularly executed instrument. It is executed according to the Kentucky statutes. The deed proves that one of the heirs of Hoy had passed the land to Green Clay, and he passed it to Chiles. Clay had no notice of the claims of the complainants, and he was an innocent bona fide purchaser without notice. There is no objection to the deed, founded on the fact that the parties were out of possession. No statute of Kentucky then existed making it void. This deed fully entitles Chiles to the part of the land which Mrs. Newland had, as one of the children of Hoy.

Mr. Hardin, for the tenants, contended that the whole quantity of land the appellants could claim, was seven hundred acres. One thousand acres of the two thousand surveyed under Searcy's rights belonged to Martin; and the bond, under which Boone claimed, was for seven hundred acres. Under any circumstances, no right could be asserted with success to a greater quantity. The deed, by a fair and equitable construction of the bond, was to be given when the patent issued, which was in 1805; and a transfer of the plat and certificate was a compliance with it.

[Boone v. Chiles.]

Hoy had assigned the bond to George Boone before he obtained the title, and there is no evidence that bond was ever delivered to Thomas Boone. The assignment was not under seal, and it was, consequently, affected by the law on the subject of such instruments; and five years are by the laws of Kentucky, a positive bar to claims under such instruments. A bar at law, is also a bar in equity. Sugden on Vendors, 272.

The power of attorney from Thomas Boone to George Boone, gave him authority to do all that he did do. Under that power George Boone gave up the original bond to the executor of Hoy, as he found the land was covered with adverse claims; and he took another bond to make a title to other land. This was a full compliance with the obligation, and after this the tenants purchased from South, who had the bond in his possession. They paid him, and they were in possession for upwards of thirty years before Thomas Boone commenced this suit. If George Boone exceeded his authority, who is to suffer? Certainly Thomas Boone. He remained silent for thirty years, and made no manifestations of a disavowal of the acts of his attorney. Will not the court presume every thing in favor of a possession, held under such circumstances. Will they not presume a conveyance from Thomas Boone, or some ratification of the acts of his attorney, to those who thus held the land. Cited Blight's heirs v. McElroy, Wheat. 1 Phil. ed. 124; 10 John. 337.

Twenty years' possession of land in Kentucky bars an action of ejectment; and if A has been for that time in possession, claiming under B, a conveyance is presumed. Thirty years is a bar to a writ of right, and a patent is presumed after that time. As to presumption in favor of possession, cited Cowp. 215.

This is a stale claim, which, having slept for nearly half a century, is now to be sustained by a court of equity, after the limitation of an ejectment, and even of a writ of right. It will receive no favor. It is also contended that the agreement between Thomas Boone and Boone Inglis, makes this a case of champerty. Cited 1 Hawk. Pleas of the Crown, 471, ch. 27; Statute of Hen. 8, against purchasing pretence titles; Dig. Law Kentucky of 1798; Littel's Dig. 215.

The heirs of Hoy are necessary parties, and they should have

[Boone v. Chiles.]

been brought in and have answered, before the suit could properly proceed. One of the heirs is an idiot; and she could not defend by an ordinary guardian, but a guardian should have been appointed by the court. George Boone, or his heirs, and Reuben Searcy, or his heirs, were also necessary parties. Cited 3 Bibb, 11.

Mr. Crittenden, for the appellants, argued that this case is no more than the common claim of the holders of an equitable title to obtain the legal title ; to which they have full right in equity. The evidence in the record fully establishes the right of the complainants, under Searcy ; and that right they have never parted with. Neither the frauds of George Boone, or that of Chiles, can avail to defeat their rights: and last of all, will this court be disposed to protect Chiles, who, with a full knowledge of the rights of the complainants, has sought to defeat them, while pretending to establish them.

An objection has been raised on the ground that the bond does not sufficiently describe the land, so as to enable the court to carry the contract into execution ; but this is not well founded. The tract of land is named, and the contract is for one-half. The decisions of the courts of Kentucky sustain a claim of this kind : and it is the delight of a court of equity to carry contracts into execution, if it can, possibly, be done. The construction of the powers of chancery claimed by the defendants, would defeat its legitimate and most necessary and most salutary functions. If any difficulty does exist, the court will have the portion allotted by a reference to a commissioner; a practice which exists in England, as well as in this country. As to the excess of land, it is inconsiderable ; certainly not sufficient to require that the contract shall be reformed.

It has been contended, that the transfer of the plat and certificates, by Searcy to Hoy, was a performance of the bond. This was not so. Performance to Hoy, was not performance to Boone. But if Searcy did comply with his bond, still the complainants have their rights against Hoy, to the same extent as against Searcy. The assignment is special, and is equivalent to a bond from Hoy to convey, and the bill is against his heirs.

[Boone v. Chiles.]

While it is said Searcy has complied with his contract, it is yet said he or his heirs should be made parties! The only important questions in this case are, whether Thomas Boone has parted with his rights; and whether these rights are lost by lapse of time.

The power of attorney to George Boone, gave no right to sell the land, or to impair the title to it. It authorized his completing the title, and no more. Those who claim to derive a benefit from the acts of an attorney, must look to his powers. The assignment made by George Boone to South, purports to be under the power of attorney: and yet no such authority was given by it.

Nor can the allegation be supported, that Thomas Boone parted with his right to Hezekiah Boone. It was a conditional contract, and the condition was not performed. It was abandoned by Hezekiah Boone, and he paid no part of the consideration mentioned in the agreement. Chiles sought out Hezekiah Boone, and availed himself of the agreement; using the name of Thomas Boone to obtain in the Bourbon county court a title in him : thus availing himself of Thomas Boone's equity, procured a deed to be made to him. This was in 1817, and the present suit was commenced in 1822.

The lapse of time is no bar in favor of the tenants. While the general rules in favor of presumption are not denied, it is not admitted that they apply to the claims set up by them. Mere possession is nothing; and the right growing out of it depends on the character of that possession. Possession is merely adverse, when held subordinate to the party from whose title it is derived. Under such circumstances, it enures to the benefit of him who has the right; and this was the case of the tenants : not having entered under an adversary title, they cannot claim adversely. But whatever might have been the position of the tenants, under a long possession, had they rested on their possession, and resisted the claims of all who desired to interfere with them upon it; they surrendered all such protection when they purchased from South, who claimed no title but under the bond of Boone. In 1792 and 1794, they took that title derived from Hoy; and they remained under it until 1817. The evidence fully establishes that they never set up any other title; they alleged no

[Boone v. Chiles.]

conveyance, but asserted to derive all they had under South, who asserted that he had Thomas Boone's title, derived from the bond. Thus they always recognised the rights of the complainants.

The decree of the circuit court gives to the complainants four parts, or one-half; but if the title remained in Hoy's heirs, they show a title to six-eighths, or two-thirds; and they have also the right of Mrs. South. The only remaining right is that of Newland and wife.

They conveyed to Green Clay, who conveyed to William Chiles, and the question is whether Clay was a bona fide purchaser. This is denied. He did not stand in a situation to have any protection as such. In his answer he denies notice, generally, but he does not deny all the allegations in the bill. To entitle himself to protection, he must show payment of the consideration before notice. He must allege that the persons under whom he claimed were seized, or pretended to be seized: and the evidence shows that Newland and wife were not in possession; but that the land was in the actual possession of others, claiming title. This was enough to put a party on inquiry.

Chiles asserted in his bill in the Bourbon court, that Clay had notice; and the deed from Newland and wife is a mere quit-claim deed. It is denied that the holder of a mere quit-claim deed can be a bona fide purchaser. Chiles cannot avail himself of Green Clay's title, even if it were valid.

The statutes of Kentucky make a deed, executed under a decree, vest the legal title; and Chiles, under the decree of the Bourbon court, had a legal title to the land. The reversal of the decree did not divest the title. But if it did revoke the deed, it was like a purchase pendente lite; and this court is not bound to notice it.

As to the allegation that the case is affected by champerty, it will be found on a reference to the Kentucky statutes, that no law of champerty existed at the time of the contract between Thomas Boone and Boone Engles. Subsequent to that time, the law was revived; but it had been repealed.

Mr. Justice BALDWIN delivered the opinion of the Court

[Boone v. Chiles.]

Reuben Searcy was entitled, in virtue of the law of Virginia of May 1779, as an actual settler, to four hundred acres of land in right of settlement, and a pre-emption of one thousand acres adjoining; one-half whereof he gave to John Martin for location and patenting; and by bond, dated 24th September, 1781, bound himself to convey seven hundred acres thereof to William Hoy, " as soon as deeds are made to lands in this country in general." Hoy was to have the first choice of the lands—he bought Martin's share. On the 15th December, 1781, Hoy, by an endorsement on the bond, assigned it to George Boone, his heirs and assigns; obliging himself " as surety to the within bond, and if the within lands cannot be obtained, by reason of a prior claim, then, and in that case, seven hundred acres, equal in quality and convenience, shall discharge the within bond." On the 30th April, 1783, George Boone, by another assignment on the bond, assigned his right to Thomas Boone, his heirs or assigns, without recourse, if Hoy or his heirs are sufficient to make good the bond; if not, George Boone bound himself and heirs to make it good to Thomas Boone, his heirs and assigns.

William Hoy obtained a patent in his own name, in 1785, for the whole tract; containing, by actual survey, about two thousand acres. Thomas Boone was in Kentucky in 1802, 1810, and 1819, in the neighborhood of the land, but never took possession of any part, or instituted any suit to recover them; he resided and died in Pennsylvania. In 1823 he filed a bill in the circuit court of Kentucky, against William Chiles, Hezekiah Boone, George Boone, Nicholas Smith, jr., Nicholas Smith, sen., Jacob Smeltzer, George H. Baylor, Joseph Smith, John Evalt, and Joseph Cummins, praying for a conveyance of the legal title, and account of rents and profits; and such other and further relief as his case may require. After his death, in December 1817, the bill was duly revived by his heirs. By an amended bill the heirs of John South were made defendants, in 1824. By another amended bill, the heirs of William Hoy were likewise made defendants, in 1827. In 1832 the plaintiffs, by an amendment to their bill, averred that Reuben Searcy was dead, intestate, and without heirs in Kentucky; and made the heirs of George Boone parties.

The several answers of the defendants present distinct cases

for our consideration : each depending on its own circumstances, requires a separare view and examination : that of William Chiles will be first considered. The general ground of relief set forth by the plaintiffs, against all the defendants, is founded on the assignments of Searcy's bond to. Thomas Boone, as conveying the equitable title to the seven hundred acres, of which Hoy held the legal title ; on this the general equity of the bill depended, which the plaintiffs made out. In the original bill, it was charged against William Chiles, that Thomas Boone, by the bond and assignments, had a clear equity to the one-half of the land patented to Hoy, (but was content to hold the parcels decreed to Chiles, as afterwards explained,) of which plaintiff had never been divested. That in 1802 he had made an assurance, that he would convey to Hezekiah Boone, provided he would pay him in four years, seven hundred pounds; but the purchase was declined ; no money paid, and the arrangement given up. That in 1818, Chiles and the other defendants, in their own and complainant's name, filed a bill in the Bourbon circuit court of Kentucky, against the heirs of Hoy ; charging that plaintiff sold the land to Hezekiah Boone, and he to Chiles, and that all the plaintiffs in that suit desired the heirs of Hoy to convey the legal title which was prayed for by the bill ; that Chiles obtained a decree for a conveyance, and a deed from a commissioner appointed by the court, to himself, of the interest of Hoy's heirs ; Chiles having full notice of Thomas Boone's title, and that the contract with Hezekiah Boone had not been complied with. The bill also charges, that the Bourbon suit was fraudulently instituted, and prosecuted without the knowledge of Thomas Boone ; that he never consented that the deed should be made to Chiles, who had no just claim to the land, but had engaged to maintain Smeltzer, Smiths, Evalt, Cummins, and Baylor in the possession of it. Chiles, in his answer, admits the bond and assignment to Thomas Boone ; he then sets up a sale by Thomas to Hezekiah Boone ; and that on the 30th October, 1817, he, Chiles, purchased from the latter, by a written contract referred to. He admits the suit in Bourbon county was brought by himself, Thomas Boone *the now complainant*, George and Hezekiah Boone ; on which there was a decree and conveyance made to him as charged, and refers to

the proceedings in that suit; relying on it as a bar to all claim by Thomas Boone for the purchase money.   He admits full knowledge of plaintiffs' interest, coupled with the knowledge that he had parted with it; that the sale was ratified by his agent, by power of attorney, and the agent's signature to the contract of purchase; both of which are made part of his answer.  He insists on the sale to Hezekiah; denies fraud in instituting the Bourbon suit; and answers its being done without plaintiffs' knowledge, by averring it was under the power of attorney, and contract with Hezekiah Boone; and pleads the record as an estoppel in bar of plaintiffs' assertions; which he denies.

He also further states, that he has purchased out and holds the interest of Hoy's heirs, as he can show by title and contracts regularly made out; and sets up the lapse of time and total dereliction of his claim, as a bar to plaintiffs' right to any land.  The answer concludes by averring payment by Hezekiah to Thomas Boone, of the money due on the contract of 1802; if any balance is due, offers to pay it; but insists that plaintiff has no right to the land to which Chiles hold the legal title, and has a right to hold it; on doing equity to plaintiff, if not already done.

In the amended bill against Hoy's heirs, the plaintiffs charged Chiles with having fraudulently, and with knowledge of Thomas Boone's equitable interest, obtained a conveyance of the title of three of the children of William Hoy, one of whom was Celia Newland and her husband.

In answer to this bill, Chiles admits the purchase from two of these children directly to himself, and that Newland and wife sold to Green Clay, who conveyed to him : he then alleges Clay to have been an innocent purchaser for a valuable consideration, without notice, till his purchase was complete, and prays protection as to this part of the land.

This presents the contest between the plaintiffs and Chiles in a double aspect: first, as to his claim generally; and next, as to his claim under Green Clay, as to the share of Mrs. Newland, which will be distinctly considered.  The power of attorney from Thomas to George Boone, dated 1st October, 1787, authorized him to demand and receive a deed from William Hoy, for the seven

[Boone v. Chiles.]

hundred acres, to act fully for him in the premises, to appoint attorneys under him ; and on receiving a title and conveyance in the name of Thomas Boone, to give a discharge of the bond and Hoy's engagement.    The agreement between Thomas and Hezekiah Boone, dated 30th November, 1802, was for the conveyance of this land, for seven hundred pounds, to be paid in four years ; with an option to Hezekiah, within that time, to take the land or not.

The agreement under which Chiles claims to have purchased is in the following words :

" Articles of agreement made and entered into the 30th day of October, 1817, between Hezekiah Boone, of the county of Woodford, and George Boone, of the county of the county of Shelby, of the one part, and William Chiles, of the county of Montgomery, of the other part, and all of the state of Kentucky, witnesseth, that the said Hezekiah and George has this day delivered up to the said Chiles all the papers they hold relative to the tract of land containing 700 acres, it being a part of a settlement and preemption granted by the commissioners to Reuben Searcy ; and the said Hezekiah and George Boone further agrees that the said Chiles shall have the free use of all the said papers, for the purpose of coercing the title to said land, if any is to be had, if not to get the amount in cash ; and the said Chiles, on his part, is to use diligence in getting the title or the cash for said 700 acres of land, and is hereby authorized to effect the above purposes, either by suit or by compromise, provided the compromise is not for less than three thousand dollars, as he may think the most advantageous to the parties to this article ; and the said Chiles further agrees, on his part, to defray all the expenses of the abovementioned investigation ; and when the above business is finished, the said Chiles agrees, further, to pay over the one equal half of the proceeds of the above business, if in cash or bonds, and if in land, the one equal half of what may be obtained, to the said Hezekiah Boone, and the other half the said Chiles keeps for himself ; and the said George Boone declares himself satisfied with the above contract.  For the true performance of the above, the said Chiles and Hezekiah Boone bind themselves each to the other in the

[Boone v. Chiles.]

penalty of ten thousand dollars. Given under our hands and seals the date above written.

Hezekiah Boone, [seal.]
George Boone, [seal.]
*Attorney in fact for Thomas Boone.*

" Teste, &c. William Chiles, [seal.]"

These are the papers referred to in Chiles's answer, on which he relies to make himself a purchaser of the equitable title of Thomas Boone; under which he obtained a decree of the Bourbon court, a deed from the commissioner of the whole legal title of Hoy's heirs, and a deed from two of them to himself.

From the evidence in the record, it appears very clearly, that Hezekiah Boone never complied with the agreement with Thomas Boone; paid no part of the purchase money; and abandoned the contract many years before the agreement with Chiles, to whom the state of the contract was explained before his agreement with Hezekiah and George Boone. As a matter of law, it is equally clear, that the power of attorney to George Boone, gave him no authority to sell the land, or to take a conveyance from the heirs of Hoy, to any other person than Thomas Boone or his heirs. Chiles admits, that when the agreement was made between him, Hezekiah and George Boone, he knew of the title of Thomas Boone; that he instituted and conducted the suit in the Bourbon court, under the power of attorney to George Boone, who signed the agreement of 1817, as the attorney in fact of Thomas, Chiles does not pretend to have ever paid, or agreed to pay any thing for the land: on the contrary, the agreement shows he was to pay nothing from his own pocket, in any event, except the expenses to be incurred. It does not even purport to be a purchase, or contain one clause or word which can be construed as such. The papers are delivered up to him for the purpose of coercing the title, or getting the amount in cash; one-half of which, in case of success, he is to give to Hezekiah Boone, and retain the other for his own use. Nothing is to go to Thomas. George Boone, his agent, consents to it; and Chiles procures the legal title to himself in virtue of these papers.

[Boone v. Chiles.]

Such is the case between the parties, as presented by the pleadings, exhibits, and evidence.   A court of equity must be regardless of all its rules, before it can recognise Chiles as a purchaser, or as having any right whatever in the land : it must also forfeit its character, if it sanctions such a course of iniquitous fraud.   We deem it wholly useless to contrast the relative equities of the plaintiffs and Chiles, in order to affirm their right to a decree for the conveyance of the legal title, obtained in violation of every principle which governs courts of equity ; unless he has made out some objections to the relief prayed, on grounds unconnected with the justice of the case.

It is objected that, inasmuch as the condition of Searcy's bond to Hoy was satisfied on the latter obtaining the patent, the plaintiffs can have no equity by its assignment.   This would be a sufficient answer to a suit against Searcy ; but is none to a suit against Hoy's heirs, to enforce the performance of the terms of the assignment from Hoy to George Boone ; which were an agreement to transfer the seven hundred acres, or an equivalent in quantity and convenience.   As between Hoy and Boone, and his assigns ; this gave a right to call on Hoy for the legal title, which Chiles has taken to himself, when the equity was in the plaintiffs ; whose equity depends, not on the bond of Searcy, but the contract of Hoy, made by the assignment of his equitable interest in the land.

This view of the case, disposes of the objection that the heirs of Searcy are not parties : they had no interest in the land ; their father's bond was satisfied by the performance of the condition, when the patents were obtained by Hoy ; who, by purchase from Martin and Searcy, held the legal title to the whole fourteen hundred acres, subject to be divested only by the equity of Boone, derived by this agreement to transfer the one-half.   No act, therefore, remained to be performed by the heirs of Searcy ; the title of Boone becomes complete, by the union of his equitable, with Hoy's legal title, without any interposition of the heirs of Searcy, who have no interest to defend or title to convey.   The purchase from Martin removes another objection, arising from Hoy having the first choice of the land, and dying without having made it ; whereby, as is alleged, the subject-matter of the

bill was too vague to authorize a decree in favor of the plaintiffs. As Hoy held the whole tract, there was no necessity for his making the selection, it being immaterial to him which part he held under Martin or Searcy: his not making the election, and holding the whole in fraud of the rights of his assignee, could not prejudice him, to whom he had transferred as well the right of selection, as the land itself, in equity. Independently, however, of this consideration, we think that the identity of the land is ascertained by the terms of the bond and assignment, as well as the parties themselves; it was the one-half of the claim of Searcy, both by pre-emption and settlement, to be chosen by Hoy; whose assignees had the same right to choose as had been in him. Chiles, under the pretence and claim of being Hoy's assignee, made the choice by selling to the Smiths and Smeltzer, the parts of the land on which they resided: and the plaintiffs, by their original bill, agree to take their share of the land, according to the decree of the Bourbon court, in that place. This selection is, therefore, binding on both parties; so that Chiles is not at liberty to contest the location, made first by his own act in the sale to the occupants, confirmed by a decree obtained at his own suit, and agreed to by the plaintiffs, as to the part to be conveyed.

It is further objected, that there is a surplus in the survey to which the heirs of Boone are not entitled; if this objection could be sustained by any of the parties to this suit, it could be only by those whose rights by purchase or possession would be disturbed, by decreeing to the plaintiffs more than the seven hundred acres. As Chiles has neither any right by purchase, or any equity by long possession or improvements; but claims only by the fraudulent assumption of the plaintiffs' equitable title; the land exclusively claimed by him, would be the first to be appropriated to them; and any surplus would be reserved for the benefit of those who had some pretensions to an equitable interest in it.

The lapse of time and the staleness of the plaintiffs' equity, is also set up as a bar to a decree in their favor; but whatever effect time may have in equity in favor of a possession long and peaceably held, it can have none in favor of Chiles, whose only claim is under the equity of Thomas Boone, and against whom the pre-

[Boone v. Chiles.]

sent suit was brought in six years after he first interfered with it. It cannot be permitted to him to acquire the legal title of Hoy, in virtue of Boone's equity, and to hold it to his own use ; on the ground that Boone's right had become extinct by the lapse of time, before he acquired it. The means by which the legal title has been conveyed to Chiles, have affected his conscience too deeply with fraud, for a court of equity to suffer him to enjoy its fruits. As to him, the plaintiffs have established a right to a decree for the conveyance of whatever title he may have derived by any conveyance to himself directly, of the legal right of Hoy's heirs.

The next aspect of the case between the plaintiffs and Chiles, is presented by the interposition of Green Clay, as an innocent purchaser from Newland and wife, for a valuable consideration, without notice ; under whom he claims protection.

In the amended bill, the plaintiffs charge the purchase from Newland and wife to have been made fraudulently, and with notice of their title ; in answer to which Chiles states that Green Clay bought and received the title from John Newland and wife, knowing which, he made him a defendant in the Bourbon suit, charging him to be a guilty purchaser, with notice of the equity arising from the bond of Hoy ; but, Clay denying notice, and not being able to prove it, Chiles bought his share, paid for it, and obtained a conveyance. He then refers to Clay's answer in the Bourbon court ; and insists that Clay was an innocent purchaser for a valuable consideration, without notice till his purchase was complete.

In that suit Chiles had charged Clay not only with notice, but that he purchased from Newland and wife, binding himself to make good all the contracts of William Hoy. In his answer, Clay states, that the contract he made with Newland and wife was bona fide, in good faith, for a valuable consideration paid them without notice, or knowledge of any claim by Chiles ; which he believes is founded in fraud and imposition ; " as to the contract between this respondent and Newland and wife, it is committed to record, and will speak for itself; and this respondent believes the complainant Chiles has misrepresented the true meaning thereof ;" but does not deny the averment that he was

bound to perform Hoy's contracts.    The answer of Newland and wife to this part of the amended bill, states that, if they ever had any interest in the land, they have transferred their interest by a writing, amounting to a quit claim, to Green Clay, but they never conveyed their title by deed to him or any one else.    This is the substance of all the pleadings on this part of the case.    In 1821, the Bourbon county court made a final decree in favor of Chiles; as well against the heirs of Hoy, as Green Clay; which was reversed by the court of appeals in 1827, for the want of proper parties, without any examination of the merits.

In March, 1825, Green Clay, by his indenture, granted to Chiles all the right, title, and interest which he holds by a deed from Newland and wife, dated 23d of May, 1814, to the tract of Searcy, and a pre-emption and settlement right of one Townsend, in consideration of two hundred and sixteen dollars, with warranty against himself and heirs, but against no other person.

The deed from Newland and wife to Green Clay was not referred to in the pleadings, made an exhibit in the cause, or so far as appears, used in the circuit court; it was no part of the record before us at the argument of this cause at the last term, and no suggestion of diminution was then made.    At the May sessions of the circuit court, on a suggestion of the defendant, that this deed was on file, and had been used at the hearing, the court ordered it to be certified to this court; and the counsel for plaintiffs having agreed to consider it as returned on a certiorari: it has been read, and we have taken it into our consideration as an exhibit in the cause.    In doing this, however, we must be distinctly understood, as clearly of opinion, that it is not admissible by the rules of appellate courts; who can act on no evidence which was not before the court below, or receive any paper that was not used at the hearing.    9 Pet. 731.    Nor would it have been a proper subject for that court to have considered, had it been offered to make out the case of the defendant; the deed was not set up or relied on in the answer of Chiles or of Clay, which was referred to and made a part of it; the existence of such a deed was no part of their allegations.    Clay asserted merely a contract; Chiles alleged only that Clay bought and received the title of Newland and wife, without stating what the

[Boone v. Chiles.]

title was, or how purchased; whether by deed or otherwise. There was, therefore, no allegation in the answer of either, which referred to the deed; it was not made a part of their case, which was put on a *contract* of purchase, and not a *deed* consummating it by a conveyance. A party is not allowed to state one case in a bill or answer, and make out a different one by proof: the *allegata* and *probata* must agree; the latter must support the former, 4 Mad. R. 21, 9; 3 Wh. 527; 6 Wh. 468; 2 Wh. 380; 2 Pet. 612; 11 Wh. 103; 6 J. R. 559, 63; 7 Pet. 274: and there is no one subject of equity cognizance, on which there is a wider difference between a deed and a contract of purchase, than in the one now under consideration. A purchaser with notice may protect himself under a purchaser by deed without notice; but cannot do it by purchase from one who holds or claims by contract only. The cases are wholly distinct. In the former, the purchaser with notice is protected; in the latter, he has no standing in equity, for an obvious reason: that the plaintiffs' elder equity shall prevail, unless the defendant can shelter himself under the legal title acquired by one whose conscience was not affected with fraud or notice, and who can impart his immunity to a guilty purchaser, as the representative of his legal rights fairly acquired by deed, in such a manner as exempts him from the jurisdiction of a court of equity. Such a purchase affixes no stain on the conscience, and equity cannot disturb the legal title. But as it does not pass by a contract of purchase without deed, the defendant can aquire only an equity, the transfer of which does not absolve him from the consequences of his first fraudulent purchase. His second purchase of an equity will not avail him more than the first, for the original notice of the plaintiff's equity taints his conscience, so as to make him a mere trustee, if he holds the legal title from one who is not an innocent, bona fide, purchaser. If, then, Green Clay purchased only by contract from Newland and wife, they held the legal title; such was the case presented by the answer on which Chiles must stand at the hearing: but if permitted to rely on a deed; the court would render a decree on a case not before them, or one which the plaintiff would be prepared to meet. 6 J. C. 349. For these reasons we should have omitted any notice of this deed, but as it has been commented

on in the argument, and it is for the interest of all parties that the merits of the case be finally adjudicated; we have, for this purpose, considered it as evidence in the cause. It is an indenture for the consideration of one hundred dollars, granting to Green Clay, his heirs and assigns, all the right, title, claim, and interest of Newland and wife in the real and personal estate of William Hoy; all debts, dues, demands, rents, and profits, in law or equity, to which she was entitled as one of his heirs and legatees, with warranty against themselves and all claiming under them; but against no other person whatever; and with also an agreement for further assurance, but in such a way as not to make themselves liable further than to convey such title as descended to them from William Hoy.

This is the case set up in the answer, and made out by the proofs in the cause, to make out Green Clay to be such a purchaser, that his deed to Chiles will absolve the latter from the consequences of his fraudulent purchase, with full notice of the plaintiffs' equity; whether this is such a sase as will give to Chiles the protection he claims, depends on the rules which courts of equity have adopted as to bona fide purchasers, for a valuable consideration, without notice.

It is a general principle in courts of equity, that, where both parties claim by an equitable title, the one who is prior in time is deemed the better in right. 7 Cr. 18; 18 J. R. 532; 7 Wh. 46: and that where the equities are equal in point of merit, the law prevails.

This leads to the reason for protecting an innocent purchaser, holding the legal title, against one who has the prior equity: a court of equity can act only on the conscience of a party; if he has done nothing that taints it, no demand can attach upon it, so as to give any jurisdiction. Sugden on Vend. 722. Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser, who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it, or adverse claim to it: and when, in addition, he shows a legal title from one seised and possessed of the property purchased, he has a right to demand protection and relief, 9. Ves. 30–4, which a court of equity imparts liberally. Such suitors

[Boone v. Chiles.]

are its most especial favorites. It will not inquire how he may have obtained a statute, mortgage, incumbrance, or even a satisfied legal term, by which he can defend himself at law, if outstanding; equity will not aid his adversary in taking from him the *tabula in naufragio*, if acquired before a decree.  Shower, P. C. 69; 4 B. P. C. 328; 1 D. & E. 767; P. C. 65; 7 V. 576; 10 V. 268, 70; 11 V. 619: 2 Ch. Cas. 135, 6; 2 Vin. 161; 1 Vent. 198.   Relief will not be granted against him in favor of the widow or orphan.   P. C. 249; 2 V. jr. 457, 8; 5 B. P. C. 292; nor shall the heir see the title-papers. 18 Vin. 115; 1 Ch. Cas. 34, 69; 2 Freem. 24, 13, 175; it is a bar to a bill to perpetuate testimony, or for discovery. 1 Harrison's Ch. 261, 3; Sugden 723, 4, 1 Virnon, 354, and goes to the jurisdiction of the court over him; his conscience being clear, any adversary must be left to his remedy at law, 2 V. jr. 457, 3 V. jr. 170, 183, 9 V. 30, and 18 J. R. 532, 7 Cr. 18.

But this will not be done on mere averment, or allegation; the protection of such bona fide purchase, is necessary only when the plaintiff has a prior equity; which can be barred or avoided only by the union of the legal title with an equity, arising from the payment of the money, and receiving the conveyance without notice, and a clear conscience. It is setting up matter not in the bill; a new case is presented, not responsive to the bill; but one founded on a right and title operating, if made out, to bar and avoid the plaintiffs equity, which must otherwise prevail, 9, V. 33, 34. The answer setting it up is no evidence against the plaintiff, who is not bound to contradict or rebut it, 14, J. R. 63, 74. 1 Mumf. 396, 7. 10, J. R. 544, 8. 2 Wh. 383. 3 Wh. 527. 6 Wh. 468. 1 J. C. 461.  It must be established affirmatively by the defendant independently of his oath, 6 J. R. 559. 1 J. R. 590. 17 J. R. 367. 18 J. R. 532. 2 J. C. 87, 90. 4 B. C. 75. Amb. 589. 4 V. 404, 587. 3 J. C. 583.  In setting it up by plea or answer, it must state the deed of purchase, the date, parties, and contents briefly; that the vendor was seized in fee, and in possession; the consideration must be stated, with a distinct averment that it was bona fide and truly paid, independently of the recital in the deed. Notice must be denied previous to, and down to the time of paying the money, and the delivery of the deed; and if notice is

specially charged, the denial must be of all circumstances refer-red to, from which notice can be inferred; and the answer or plea show how the grantor acquired title, Sugden 766, 70. 1 Ath. 384. 3 P. W. 2801, 243, 307. Amb. 421. 2 Atk. 230. 8 Wh. 449. 12 Wh. 502. 5 Pet. 718. 7 J. C. 67. The title purchased must be apparently perfect, good at law, a vested estate in fee simple, 1 Cr. 100. 3 Cr. 133, 5. 1 Wash. C. C. 75. It must be by a re-gular conveyance; for the purchaser of an equitable title holds it subject to the equities upon it in the hands of the vendor, and has no better standing in a court of equity, 7 Cr. 48. 7 Pet. 271. Sug-den 722. Such is the case which must be stated to give a de-fendant the benefit of an answer or plea of an innocent pur-chase without notice; the case stated must be made out, evidence will not be permitted to be given of any other matter not set out, 7 Pet. 271.

Such are the privileges of innocent purchasers, and such the guards against those who may assume their character in courts of equity; we have only to apply their law to the answers of Chiles and Clay, together with the exhibits and proofs in the case, to ascertain whether Clay filled that character when he conveyed to Chiles, or at any other time. The answers are as barren, of the averments necessary to make a case of such a purchase as would be protected against the prior equity of the plaintiffs; as the record is of the proof of any fact to support it. Nor does the consideration of the deed from Newland and wife to Clay, bring the case any nearer to the established rules and principles of equity.

Though, in form, a grant by indenture, it is in effect a mere re-lease and quit-claim, as stated by Newland and wife in their an-swer; it does not purport or profess to convey the land in contro-versy; nor does it assert any title to, or seisin of it; the considera-tion expressed does not apply to this land, more than to a legacy or personal property. The grant is definite only in one respect; that it is of whatever descended to the grantors from William Hoy, but does not specify what it was; and the words of the grant are fully satisfied, if any thing so descended, whether realty or per-sonalty. As to this land, Hoy was a trustee by his own contract; nothing did or could descend to his heirs, but the dry, barren,

legal title, without a shadow of beneficial interest; which was all that Newland and wife intended to convey, or Clay to receive by the deed. The covenants of warranty, and for further assurance, are expressly limited to their right, such as it was, and to their own acts only : they gave no covenant against the acts of Hoy: and by conveying only such interest as they held by descent, it passed to Clay with the same encumbrances of Boone's equity, as if it had remained in Newland and wife; who, neither in their answer or by their deed, pretend to any title or right. These circumstances make the deed suspicious on its face; and in the absence of affirmative proof to support the recital of the payment of the consideration, of any evidence of seisin, or even a claim of title by the grantors, rather weakens than sustain the answer. When we find the distinct admission and full proof of the prior equity of the plaintiffs, with full notice to Chiles, who claimed, not as a purchaser but by a special contract with Hezekiah Boone, for the division between themselves, of whatever, either of land or money, they could recover in right of Thomas Boone's known equity, and with the plain intent to defraud him; the purchase from Clay, and the setting him up as innocent purchaser for a valuable consideration without notice, under all the circumstances of this case; so far from purging the conscience of Chiles of its original taint, or imparting to him any protection as the representative of Green Clay, stamps the conduct of both with bad faith. Chiles appears on this record, a mere pretender to a purchase; by his agreement with Hezekiah Boone and George Boone, as the attorney in fact of Thomas Boone, he purchased the title of neither; his only claim under it was to the one-half of whatever he could acquire. He did not, therefore, even fill the character of a purchaser with notice, who by the rules of equity may purge his guilty conscence by purchasing from one whose clear conscience and legal title place him beyond the jurisdiction of equity; the immunity of an innocent purchaser cannot be imparted to the fraudulent usurper of another's rights without purchase.

But there is one circumstance, which saves us the necessity of considering the defects in the averments of the answers or proofs of the deed from Newland and wife to Clay, or from him to Chiles.

[Boone v. Chiles.]

Chiles states, in his answer, that being unable to prove notice to Green Clay before his purchase from Newland and wife, he purchased from Clay; yet he did so establish the fact of Clay's guilty purchase; that he obtained a decree against him in the Bourbon court. He purchased from Clay, while that decree was in full force; and now appears on the record, claiming to be protected under this purchase by the equity of Clay, as an innocent purchaser; when Clay, after being an adjudged mala fide purchaser, by the final decree of a court of competent jurisdiction, clothed Chiles with his own character by his deed in 1825. It would present the administration of equity jurisprudence in different courts on very different principles, if Clay, who could not protect himself in a state court at the suit of Chiles, could protect Chiles here, at the suit of Boone; or that Chiles, after procuring the decree against Clay, in a suit to which he made Thomas Boone a plaintiff, on the ground that he purchased with notice; should now obtain a decree against Boone, on the ground that Clay was an innocent purchaser, for a valuable consideration fully paid, without notice of any defect in his title, till it was complete at law by a conveyance in fee, and in equity by the actual payment of the money. Neither the pleadings, the exhibits, or the evidence on this record, afford us any warrant for such a proceeding: on the contrary, they make it our duty to decree a conveyance from Chiles to the plaintiffs, of whatever right or title he may have acquired by the deed from Green Clay.

We are next to consider the case of the plaintiffs, as to the other defendants. The heirs of South, by their answer, disclaim any interest in the land; nor does it appear that the heirs of Hezekiah or George Boone have any interest in the land or at any time have been in possession, or held any title under Hoy's patent. As to these defendants, therefore, there is no subject-matter for any decree, except for the dismission of the bill.

As to the heirs of Hoy, the plaintiffs have made out an undoubted right to a conveyance of the legal title. Those who have answered, set up no title or claim to the land; and they must execute the trust which has descended to them, by conveying their legal title to plaintiffs.

[Boone v. Chiles.]

John Evalt is admitted to have been in possession for more than twenty years, under an adverse title by patent to Flournoy. The plaintiffs have, therefore, no right to the land thus held.

Nicholas Smith states, in his answer, that he holds fifty acres of the land claimed by the plaintiffs, by purchase from John Jones, by deed, which he makes an exhibit in the cause; that this fifty acres is a part of Flournoy's patent, which he holds adversely to the claim of Searcy. The deed is dated in December, 1797, conveying, in consideration of one hundred and twenty-five pounds, fifty acres of land, with general warranty. Independently of the deed from Jones, it is clearly proved by several witnesses, that Smith made the purchase from him; settled on the land in 1798, where he lived till his death; and that there was a continued possession and residence on the land by him, and those claiming under him, to the present time, and valuable improvements made. The plaintiffs do not controvert this purchase or residence; they do not charge Smith with any act affecting his conscience, or show that he ever purchased, or made claim under them, or any person asserting any 'ght under their title. The title of Flournoy appears to be by an equity older than Searcy's; though his patent is later than Hoy's. We can perceive no ground of equity, to entitle the plaintiffs to a conveyance of the title thus acquired by Smith. He and those under him, have had an adverse possession of twenty-five years, before the bringing of this suit; and his possession of the fifty acres cannot be disturbed, either at law or in equity.

The only charge in the bill against the remaining defendants, is their combining to institute the suit in the Bourbon court, of which there is not only no proof, but the contrary appears by the record of that suit; they were not parties, and took no part in the prosecution of it. The bill, however, alledges that Chiles "had made some engagement to maintain Smeltzer, Smiths, Cummins, and Baylor, in detaining possession, and enjoying the profits for a long time past, still refusing to surrender." The prayer against them was " to compel the defendant, Chiles, or such of the defendants as nowh old the title, to convey the tract described by the deed under the decree to Chiles, to account for rents and profits, and such other and further relief as his case may require."

The answer of Nicholas Smith, jr., Nicholas Smith, sr., Jacob Smith, and George H. Baylor, was joint and several; jointly they denied being parties to the Bourbon suit, or being bound by the decree. They admit that Searcy claimed the land; that it was located by Martin, and patented to Hoy; allege a surplus of five or six hundred acres in the survey; and that plaintiff could be satisfied without disturbing them; plead the lapse of time, and staleness of the demand as a bar; and deny the right of the plaintiffs to recover. They state that they have been informed, that Hoy assigned Searcy's bond to George Boone; call for proof of the assignment to Thomas Boone; charge that if the bond was assigned to him, it has long since been cancelled between Thomas and George Boone; that George Boone assigned the land to John South, investing him with all the title to the land, which George Boone derived from William Hoy, by the agency, consent, and authority of Thomas Boone, if the bond was ever assigned to him. They also charge, that South, by virtue of such assignment, held the bond till his death, and that his executor held it, till Chiles obtained it by fraud; and that they are entitled to certain parcels of land, by purchase for a valuable consideration, from John South. They then aver, that Peter Smeltzer purchased four hundred acres, and took South's bond, with surety, for the title; took possession of the same in 1791, settled upon, improved, and resided on it till his death. That George H. Baylor claims under Smeltzer by purchase from his heirs, for a valuable consideration; now resides upon it; and that a continued residence has been kept upon the land, on which there are large and valuable improvements. That Nicholas Smith holds two hundred acres, by purchase from Jacob Swope, in 1797, who purchased from George Pope, in 1795, who purchased from South, in 1794. That Smith resided on this land from 1798, and made valuable improvements thereon; which residence has been continued by him, and those under him, to the present time. These defendants, then charge, that Thomas Boone was in Kentucky in 1802, 1810, and 1819; knew of the sales by South of the land they occupied, but gave them no notice of his title; and, on the contrary, disclaimed it, in conversation, and then proceed to give an account of heir connexion

[Boone v. Chiles.]

with Chiles, in substance as follows. He came to the Smiths and Smeltzer, stating that he held Hoy's legal title to the land; that South's bonds were worth nothing, and they would lose the land and improvements: whereupon they, ignorant of their rights, and the title to the land, compromised with Chiles, agreed to give him up South's bonds, and to pay him ten dollars an acre, in three annual instalments, for six hundred acres, each to pay for his own share. Chiles was to make them Hoy's title, but having received South's bonds, he obtained from his executor the bond of Searcy; struck out the assignment to South; gave up his bonds to his executor; shortly after which, he commenced the suit in the Bourbon court, and obtained the decree referred to in the bill. They charge Chiles with fraud in the whole transaction; pray that their answer may be taken as a cross bill against Chiles; that he be compelled to restore the bonds of South; or that they may have such decree against him as their case may require, and their contract with him cancelled. They deny the plaintiffs' rights to rents and profits in case of recovery: but if they lose the land, pray a just compensation for their lasting and valuable improvements; and then set up a contract between Thomas Boone and a certain Boone Engles, in 1822, in pursuance of which, the present suit was brought by him in their names; which they allege to be within the statutes of champerty and maintenance, on which they rely, as well as on the common law, the rules and principles of equity, and the statute of limitation. Cummins claimed by purchase from Smeltzer, which his heirs, in their answer, aver to be fraudulent; but if it is valid, they set up thirty years' possession of part of the land before suit brought, as a bar. Nicholas Smith, by an amended answer, refers to a copy of Searcy's bond, with all the assignments thereon, previous to the erasure of the assignment by George Boone to South; "under whom all the tenants in possession, including this defendant, claim their several portions of said seven hundred acres of land; which assignment bears date August 6, 1792. "And if said South, as executor of William Hoy, had ever sold any portion of said one thousand four hundred acres, or the moiety seven hundred acres claimed by complainants herein, (for this seven

hundred acres was never defined to any of the original pur-
chasers previous to said assignment, which is not admitted,) this
defendant relies confidently that said assignment last mentioned
of said bond to him, said South, would enure in equity to confirm
their claim; nor could its subsequent cancellation, or the sur-
render of said bond, with the consent of the executor or adminis-
trator of South, affect or impair their claims. He re-exhibits the
copy of said bond, with the several assignments thereon, and
relies on time and circumstances, to show that the one from
George Boone to South was done by proper authority from
Thomas Boone."

The cause was at issue on the general replication. At the hear-
ing, all the material facts alleged by the defendants in relation
to their purchase from and under South, their agreement with
Chiles, the surrender of South's bonds to his executor, and the
delivery by him to Chiles of Searcy's bond, with the assignments
thereon, were fully established by the exhibits and proofs in the
cause; as, also, their possession, residence, and improvements on
the land as stated in their answer. But they wholly failed in
proving that the assignment of Searcy's bond by George Boone to
John South, was made with the knowledge, consent, or authority
of Thomas Boone.

South married a daughter of William Hoy, to whom he was
executor; the agreement between Chiles, the Smiths, and
Smeltzer, was made in 1817; South's bonds were given up in the
winter of 1817,-'18, when Childs received the bond of Searcy;
the suit in the Bourbon court was commenced in January, 1818,
and is yet pending.

This suit was commenced in 1823, while the decree of the
Bourbon court was in force, and before any appeal to the court
of appeals of Kentucky: it was before this court in 1834, on a
certificate of division from the circuit court of Kentucky, on the
question whether they had jurisdiction of the cause. It was then
decided that it had jurisdiction; that the heirs of Hoy were not
necessary parties, except for the purpose of obtaining the legal
title if it remained in them; that a decree might be made without
them, as to parties properly before the court; that the heirs of

[Boone v. Chiles.]

George Boone were not necessarily defendants, and no proof need be made respecting them. 8. Pet. 535, 7. All questions of jurisdiction of parties are therefore closed.

The objections to the plaintiffs' recovery on the ground of the contract between Thomas Boone and Boon Engles being within the statutes of champerty and maintenance, cannot be sustained for two reasons:

1. The English statutes on this subject, which were adopted in Kentucky, punished the offence and declared the contract for maintenance void between the parties, but did not direct or authorize the dismission of the suit instituted between other parties in furtherance of such contract. Boon Engles is no party to this suit; and it does not concern the defendants whether it was commenced and is conducted by his agency, or by the plaintiffs themselves: the right of plaintiffs is not forfeited by such an agreement, and it may be asserted against the defendants whether the contract with Boon Engles is valid or void. S. P. Litt. Select Cas. 522.

2. By the act of 1798, which was in force when this contract was made and suit brought, no person could be prevented from prosecuting or defending any claim to land held under the land laws of Virginia; nor shall any suit brought to make good such claim be considered as coming within the provisions of the common law or any statute against champerty or maintenance. 1 Mor. and Brown, Kent Stat. 282, 5. These statutes were not revived till 1824.

The first question of fact which arises, is in what right the Smiths and Smeltzer first entered upon the land purchased from South. The amended answer of Nicholas Smith, junior, is explicit on this point; stating that all the tenants in possession, including himself, claim under South, by the assignment of George Boone to him. Though this answer is not evidence against the other defendants, yet, as they do not deny notice of the assignment to Thomas Boone, before their purchase, and in their answer pray for a restitution of South's bonds, there is good reason to believe the statements of Smith, especially in connexion with the proofs in the cause.

Barbara Smeltzer, the widow of Peter, testifies that he set-
tled on the land in 1791 ; South came down and marked out the
four hundred acres ; that it was held under South, who claimed
under the bond from Searcy, assigned by Hoy to George Boone.
That at the time they first settled, South represented to Smelt-
zer that he had traded for that bond, they were soon after in-
formed that he had not got the bond, but soon after obtained it
from George Boone; that Smeltzer soon afterwards informed
George Boone of what had been done, who appeared well
pleased.

William Johnson testifies that Smeltzer purchased from South,
and began to improve in 1786. L. Eastin states that he took pos-
session in 1789. It is also testified by William Boone, that
South had sold before he got the bond from George Boone ; and
the evidence of Mrs. Smeltzer is strongly corroborated by Ben-
jamin Mills, esquire, to whom some of the Smiths and Smeltzers
made a professional application relative to the chain of title be-
tween South and Hoy. He found no authority to George Boone
to assign the bond to South, which was the only claim, or color
of claim, he had to the land ; hence and from his knowledge of
South's character, he concluded he had sold without claim, and
brought no suit for them. Joseph Steele testifies to the declara-
tion of George Boone, that South was in treaty with him for the
bond, for some time before the assignment was made ; and that
Smeltzer was informed previous to his purchase, that the land
belonged to Thomas Boone. No objection having been made
on the hearing to the deposition of Steele in relation to the
declarations of Boone, they are competent evidence ; and in con-
nexion with that of the other witnesses, fully support the testi-
mony of Mrs. Smeltzer, and the amended answer of Smith. We
must, therefore, consider Smeltzer as having purchased from
South, his right under the bond of Searcy, and the several as-
signments down to South, with notice thereof. Smith's amended
answer is conclusive, that he so purchased the two hundred acres
in 1797, by the assignment of South's bond. In his deposition he
also states, that he soon afterwards purchased from South sixty
or seventy acres, in addition, of which he took possession, and

has ever since held, under the same claim; that he lent South three hundred dollars, which was to go in part payment of the land, but finding South had no title, he recovered it back by suit.

In 1817 the parties stood thus: Smeltzer had been in possession, under a claim of title by Searcy's bond and assignments for twenty-six years, of four hundred acres. Smith had held possession of the two hundred acres nineteen years, which, added to the possession of Pope and Swope from 1794, made twenty-three, and of the sixty or seventy acres for about eighteen years, when they gave up South's bonds, and agreed to purchase from Chiles, who claimed the legal title of Hoy. During this time, Thomas Boone had neither affirmed or disaffirmed the sale by South, made no entry on the land, gave any notice to Smith or Smeltzer, instituted no suit, or made any effort to obtain the legal title from Hoy's heirs; though his right was then the same as now made out, and had been vested in him for thirty-six years. He made George Boone his agent in 1787; yet, for thirty years he appears to have been wholly inactive, in asserting or endeavoring to complete the title. The agreement with Hezekiah Boone in 1802, seems to have been the only positive assertion of a right in the land made by Thomas Boone. When the present suit was commenced, Smeltzer, and those under him, had been in possession thirty-two years; Smith twenty-five years of the two hundred acres, and twenty-one of the sixty or seventy acres; and the equity of Boone arose forty-two years before.

From this state of facts, it is perfectly clear, that, if Smiths and Smeltzer can be considered as claimants in their own right, adverse to the title of Thomas Boone, the lapse of time alone is a complete bar to any equitable relief: the rules of equity as to the effect of time in favor of possession, are too well settled to be stated or doubted. 2 Jac. and Walker 138, &c., 9 Wh. 497. 10 Wh. 168. 3 Pet. 52. 6 Pet. 66. 5 Pet. 491. 7 J. C. 122. 10 Wh. 150, 74. 9 Pet. 416.

Thomas Boone's only standing in a court of equity, is by considering these defendants as his trustees, by their purchase under South or Chiles, or both. As neither of them sold by any lawful authority from him, he is not bound by, and may repu-

diate their acts; the consequence of which, would be a bar of his claim on these defendants holding adversely. But as South assumed the right to sell the interest of Thomas Boone, in virtue of the assignment from George Boone, as his attorney in fact, and Chiles acted throughout all his proceedings, under the agreement signed by George Boone in the same capacity, which was an express recognition of the original right of Thomas Boone; he may waive the defect in the power of attorney; ratify the acts of his agent, and elect to consider the purchasers from South and Chiles as holding through and under him. When the purchasers from them discovered that neither South or Chiles had any right in the land, they too had a right of election to hold under the title which they intended to purchase; under which they had taken possession of the land, and held it till the discovery of the fraud: or to disclaim the purchase, renounce all rights consequent upon it, and remain in possession as claimants adverse to the title under which they entered.

It is unnecessary to decide on the effect of such disclaimer, had it been made before the purchase from Chiles, or the filing the bill. We cannot find in the evidence or pleadings, that Thomas Boone ever made any election, as to considering these defendants holding under or adverse to him: but it is very clear that they originally purchased, entered, and held under his title; and it does not appear that they ever assumed an attitude of direct hostility to it. We have come to the conclusion, that we must now consider them, as holding by their original claim, so far as to authorize the plaintiffs to make them their trustees, in virtue of their purchase from South, and ratify the agreement of Chiles. There is no other way in which the plaintiff can escape from the consequences of the staleness of his equity, coupled with the long possession of the defendants, than by considering them as friendly purchasers and possessors under them. The plaintiffs put themselves out of court, by setting up the purchase and possession of defendants as adverse to their equity: for they then would have no protection against the lapse of time, which they have neither explained or accounted for; 17 V. 88, 9, 96. 1 J. and W. 62, 3, and note. 1 J. C. 47, 8. 3 J. C. 586. 1 J. C.

354. 5 J. C. 187, 8. 3 J. C. 218, and all bills in equity which seek to disturb long possessions, deserve the utmost discouragement; 1 Atk. 467, 1 J. and W. 62.

The plaintiffs must, therefore, make their claim on the defendants, as their trustees, by direct contract, or by implication from the purchase under their title; in either case, the lapse of time effects them. They cannot enforce the execution of an express voluntary trust, after its known disavowal for such time, and under such circumstances as would make an adverse possession a bar; 3 Pet. 52. 7 J. C. 122. 2 Sch. and Lef. 607, 36, 8. If a purchaser is made by implication an involuntary trustee for the vendor, so as to be affected by his equity, it must be pursued in a reasonable time; 4 J. C. 316. 3 J. C. 216. 17. 4 B. C. 136, 8. 1 Cox 28, 17. V. 96, 160.

Though time does not bar a direct trust as between trustee and and cestui que trust, till it is disavowed; yet, where a constructive trust is made out in equity, time protects the trustee, though his conduct was originally fraudulent, and his purchase would have been repudiated for fraud. 4 B. C. 136. 17 V. 97. 1 B. C. 554. So where a party takes possession in his own right, and was prima facie the owner, and is turned into a trustee by matter of evidence merely, 3 J. C. 216. And where one intending to purchase the entire interest in the land, took a conveyance without words of limitation to his heirs, passing only an estate for life, the lapse of fourteen years, after the expiration of the life estate, was a protection to the heirs of the purchaser; 5 J. C. 185, 6.

What that reasonable time is, within which a constructive trust can be enforced, depends on the circumstances of the case; but there can be few cases where it can be done, after twenty years' peaceable possession, by the person who claims in his own right, but whose acts have made him a trustee by implication. His possession entitles him to at least the same protection as that of a direct trustee, who, to the plaintiffs' knowledge, disavows the trust, and holds adversely; as to whom the time runs from the disavowal, 3 Pet. 52, because his possession is thenceforth adverse. The possession of land is notice of a claim to it by the possessor, Sugden Vend. 753, 4; if not taken and held by con-

[Boone v. Chiles.]

tract or purchase, it is from its inception, adverse to all the world, and in twenty years, bars the owner in law and equity; 8 Cr. 250. 4 Wh. 221. 5 Pet. 354. A purchaser in possession by a contract to sell, is in law a trespasser; but in equity he is the owner of the estate, having taken possession under the contract, and the vendor is in the situation of an equitable mortgagor, 15 V. 138. If the entry was by purchase, and the purchaser claims the land in fee, he is not a trustee; his title, though derivative from, and consistent with the original title of the plaintiffs, is a present claim in exclusion of, and adverse to it. A vendee in fee, derives his title from the vendor.; but his title, though derivative, is adverse to that of the vendor: he enters and holds for himself. Such was the doctrine of this court in Blight's lessee v. Rochester, 4 Pet. 506, 7. In that case the court said, " The vendee acquires the property for himself, and his faith is not pledged to maintain the title of the vendor."

" The only controversy which ought to arise, respects the payment of the purchase money, how far the vendee is bound to this, by law, or by the obligations of good faith; is a question depending on all the circumstances of the case.

" If the vendor has actually made a conveyance, his title is extinguished in law as well as equity; if he has sold, but has not conveyed, his contract, of sale binds him to convey, unless it be conditional; if, after such a contract, he brings an ejectment; he violates his own contract, unless the condition be broken by the vendee, and if it be, the vendor ought to show it." " If defendant claims under a sale from plaintiff, and plaintiff himself is compelled to assert that he does; then the plaintiffs themselves assert a title against this contract. Unless they show that it was conditional, and that the condition is broken, they cannot, in the very act of disregarding it themselves, insist that it binds the defendant in good faith, to acknowledge a title which had no real existence. Upon reason, then, we should think, that the defendant in this case, under all the circumstances, is at liberty to controvert the title of the plaintiff." 7 Wh. 548, 50.

In applying these principles to the case before us, it is very clear that neither the purchase from South or Chiles, is any

equitable estoppel to the defendant's controverting the title of Boone; when he disaffirms and violates the contract of purchase, by seeking to turn them out of possession. He cannot make them constructive trustees by their purchase, and then be permitted to disavow the purchase; without subjecting himself to the consequences of delaying the prosecution of his right. As trustees by implication, in equity, they may claim the benefit of the lapse of time; if he considers them as purchasers from him, or by a title derived from him, he can have no hold upon their conscience, to surrender him the possession, if they are willing to pay the purchase money. Whether they purchased from him, or from another, who assumed to sell by his authority and in his right, matters not; if they claim by his title, and thus become his trustees by his affirmance of the sale, the law of equity compels him to assert his rights in a reasonable time. When he does so, the execution of the trust will be enforced; but it will be enforced on both parties according to the terms of the purchase, and the trust which equity raises on it by implication. Equity makes the vendor without deed, a trustee to the vendee, for the conveyance of the title; the vendee is a trustee for the payment of the purchase money, and the performance of the terms of the purchase. But a vendee is in no sense the trustee of the vendor, as to the possession of the property sold; the vendee claims and holds it in his own right, for his own benefit, subject to no right of the vendor, save the terms which the contract imposes; his possession is, therefore, adverse as to the property, but friendly as to the performance of the conditions of purchase.

In virtue of his legal title, the vendor has a legal right of possession, but equity will not permit him to assert it, unless the vendee has violated the contract: he will be enjoined if the vendee performs it. It is very certain, that a sale of the legal title by deed, creates no legal estoppel, by which a purchaser is prevented from contesting the title of the vendor, or the title of any person from whom the vendor derived title, 7 Wh. 547, &c. It is equally certain, that the sale of an equitable title by bond, or other contract, cannot have a contrary effect in equity; which

[Boone v Chiles.]

decides according to the *equum et bonum* of each case. In this case, Boone comes into court to obtain possession under an equitable title only; he is barred by time, unless he can make the defendants his trustees at the institution of the suit; he charges them with no fraud, and nothing is averred or proved against them to so affect their conscience, as to give a court of equit jurisdiction. He is thus compelled to rest on their purchase of his title from South and Chiles, making them constrctive trustees; which, on the pleadings and evidence, we are of opinion he may do. There is, then, a trust between them, but it is that trust which, in equity, results from the contract of purchase. Boone is a trustee for such title as the defendants purchased, and were entitled to receive; they are trustees for the purchase money they agreed to pay for it. Boone avers they bought his title, which, we think, is made out. He, then, is the cestui que trust as to the money, and they for his title.

To divest this trust of all mutuality, would be subversive of every rule of equity; it will never award a surrender of the posse ion of land by a purchaser of an equitable title, but on a clear violation of the condition of purchase, clearly proved by the plaintiff. He is without remedy at law in this case; compelled to come into equity, he must do it; he sets up a trust in the defendants for his use : all he can ask is its execution by payment of the purchase money : if he has a decree for that, justice is done to him; and nothing can be more just than to decree that he shall perform the act in consideration of which he obtains relief. If he comes into court to turn them out, on the ground that defendants have purchased a title which must be traced up to him, in virtue of the contract of purchase; he asserts a title against this contract when he denies them the benefit of the purchase : and in the language of this court in Blight v. Rochester, the plaintiffs cannot, in the very act of disregarding it themselves, insist that it binds the defendants, in good faith, to acknowledge the title. The defendants may contest it, when set up to defeat the purchase in this case in equity, as it was done in that at law. This court did not then think their decision to be

[*Boone* v. *Chiles.*].

at variance with the decisions of the courts of Kentucky ; nor do we think that we now, in any way, interfere with them.

They have held that the possession of the purchaser from the plaintiff without deed, is friendly to the plaintiff; and stops the running of the statute of limitations, 2 Bibb 506. But that a vendee by deed, may, at law, contest the title of the person under whom he bought; though a vendee by executory contract cannot, if he is in possession under, and looks to the vendor for the completion of his title : in the first case he holds adversely, in the second not. 3 Littell 135, 6. So, if he purchases from the patentee, and holds his bond for the title, 5 Litt. 318, a defendant cannot, in ejectment, set up an outstanding title in a third person, if he purchased from plaintiff without deed, 6 Litt. 444 : nor can a tenant or one who purchases from him, contest the title of the landlord. 4 Bibb 33 ; 2 Marshall 243.

These decisions are, unquestionably, correct ; but the principle on which they are founded, is very different from that which the plaintiffs' counsel deduce from them : they admit that possession, under a deed conveying a legal title, is adverse, and that a defendant so holding may deny the title of his vendor in a suit at law. The *contract* of purchase, then, is no estoppel, though by the most solemn instrument known to the law. The same principle seems closely applicable, by analogy, to a suit in equity, in which the plaintiff rests on an equitable title only, which has been sold to the defendant, as the foundation of a decree awarding possession of the land purchased; the proceeding is analogous to an ejectment; the process of executing such a decree is the same in Kentucky, by an habere facias. It is difficult to perceive any sound reason why the same analogy should not be observed in the proceedings previous to the decree: if the defendant, a vendee of the legal title by deed, can, at law, contest the title of his vendor, who is plaintiff; why may not the vendee of an equitable title, by bond or other executory contract, enjoy the same right in a court of equity ? We are clearly of opinion that the defendants in this case had such right, and that there is nothing in the evidence before us which could have deprived them of it, had they rested their case upon their adverse possession alone : but

the admissions of Smith in his amended answer, the proofs of the cause as to Smeltzer, together with the joint answer of themselves and Baylor, place them in a different position.

As to them, we are perfectly satisfied that their possession was a perfect protection against the equity of Thomas Boone, when this suit was instituted; but we think that his equitable right to the purchase money agreed to be paid to Chiles, has been saved by their answer and the evidence in the case; our only difficulty has been, whether we can, on the pleadings, make such a decree as, in our opinion, comports with the justice and equity of the case. The specific prayers of the bill are, that such of the defendants as hold the title, convey to the plaintiff the tract described by the deed under the decree to Chiles; neither Smiths, Smeltzer, or Baylor hold this title, or claim under the decree or deed from the commissioner to Chiles; this part of the prayer cannot, therefore, be granted. The next is an account for rents and profits; this can be done as to Chiles, but cannot as to the others, on our views of the case. The general prayer is, such other and further relief as the plaintiffs' case may require. This is a broad prayer, on which such relief may be granted as is not inconsistent with the bill or the specific prayers. 8 Pet. 586. This case is one of an undoubted equitable title to the 700 acres of land, had it been pursued in time; but under the circumstances of the case it is narrowed down to a claim for the purchase money of the land, held by the defendants under the purchases from South and Chiles, at the price stipulated in their agreement with the latter. This we think is required by the case of the plaintiffs, as it appears on the whole record, without placing the defendants in any position more injurious to themselves than their answer would authorize. They pray for a restoration of South's bonds, and the rescision of the contract made with Chiles, as the means of enabling them to obtain a decree in their favor. "But should, under all the circumstances of the case, it be their misfortune to lose the land, they claim a just compensation for their lasting and valuable improvements; under such rules and regulations, according to law and equity, as their case may require and justice demand." To restore South's bonds and annul the

[Boone v. Chiles.]

contract with Chiles, would not release them from their trust to Boone for the purchase money agreed to be paid to South.    The record does not inform us what was the price at which South sold the 600 acres; but if sold at the rate at which Smith bought the 60 or 70 acres, it would, with the interest, exceed the price agreed to be paid to Chiles.    Besides, the restoration of South's bond at the time of their answer, and by a decree of the circuit court, would have bound them to pay the purchase money with interest.    In such case the lapse of time would be no bar.    If, by our decree, these defendants hold the lands on the terms stipulated with Chiles, they have the same benefit of their contract with him, as if it had been consummated by a conveyance of the legal title of Hoy, and the equitable title of Thomas Boone ; a position much more favorable to them, than they would be placed in by their prayer for the restoration of South's bonds, or for mere compention for improvements. It is not to be doubted, that they would have been content with the quieting of their possession on paying for the land, on the terms agreed on with Chiles in 1817, on which they can now hold them, consistently with the law of the case.

Though neither of the parties have prayed for the specific relief which we think they are entitled to ; we are of opinion that all have, in substance, submitted their case to our consideration, according to the rules and principles of equity : willing to abide such decree as we shall think will do justice between them. This, in our opinion, will be done by giving to both the benefits of the contract with Chiles, which, under all the circumstances of the case, created by construction and implication in equity, a mutual trust; which is executed by one party conveying his title, and the other by paying the purchase money.

It remains only to consider the case of Cummins, who purchased from Smeltzer, part of the 400 acres purchased by him from South.    We can perceive no equitable ground of discrimination between this and the other tenants ; the answer of the heir of Cummins admits the purchase from Smeltzer, but makes the same allegation of fraud against him as he did against Chiles. Yet, like the others, Cummins continued to hold, and his heir still holds the land so purchased, without, as appears by the re-

cord, having paid any thing for it: like them, too, the heir prays for a dismission of the bill, but in these words: "And hence to be dismissed with her costs, &c., and such other orders as the court shall deem necessary to the equity of her case." This could not have been intended, nor can it be considered as a peremptory prayer for dismission, as she would, in such case, hold the land without paying for it; there would be no remaining equity in her case, on which the court could make an order: it must, therefore, be considered as a submission to such decree as the court should deem conformable to the equity of the case. This, in our opinion, requires that this defendant should be placed in the same situation as the other defendants, who claim under or by the purchase from South; they all purchased only an equitable title, and must stand in the place of those from whom they purchased; each is a trustee by implication, affected by the same mutual trust in equity.

Having thus disposed of all the contending claims between the plaintiffs and the defendants, in this very complicated case, according to their respective equities between them as contending parties; we are to consider of the decree to be made between the defendants. It is within the undoubted powers of a court of equity to decree between co-defendants on evidence between plaintiffs and defendants, 2 Sch. 1 Lef. 712. Its exercise is also within the general prayer of the defendants in their respective answers; and is called for by every consideration, that requires some termination to long, inveterate, and entangled litigation. With the whole case before us, and on the fullest investigation of the rights of all the parties, we do order, adjudge, and decree therein as follows:

That so much of the decree of the circuit court as directs the defendant Chiles to convey to the complainants, all his right, title, and interest to and in the premises named in the bill, and to deliver up to the clerk of said court, to be cancelled, the contract between said Chiles, Hezekiah and George Boone, therein referred to; also, so much thereof as orders Jones and Fanny Hoy to convey all their interest in the premises, derived from William Hoy; and so much of said decree as directs, that if the con-

[Boone v. Chiles.]

veyances so directed shall not be made as ordered, the clerk of said circuit court shall convey to the complainants the interest of the said parties, as by said court decreed; and so much of said decree as orders the defendant Chiles to pay the costs of the suit, with the exception there stated; also, so much of said decree as declares that the claim of the complainants is not to be prejudiced by the decree aforesaid, as against any of the heirs of William Hoy, who are not parties to this suit; and so much of said decree as directs the bill of complainants to be dismissed as to the land held by John Evalt within the bounds of Flournoy's patent; be and the same is hereby affirmed in all things, excepting that part of said decree which excepts from the deed to be executed by William Chiles, the interest which he holds under a deed from Green Clay, as to which the said decree is reversed and annulled.

And as to the rest and residue of said decree of the circuit court, the same is hereby reversed and annulled; and this court, proceeding to render such decree as the said circuit court ought to have rendered, doth further order, adjudge, and decree—

That the said William do, and shall, within six months from this time, convey to the complainants (in the manner specified in said decree as to the land therein directed to be conveyed by him) all his right, title, and interest, held or claimed under the deed or conveyance from Green Clay to said Chiles.

That the said Chiles do, and shall, within the same time, assign, transfer, and make over any contract or agreement made between him and any other persons, in relation to the land in controversy in this suit, whereby any right accrued to, or was promised or agreed to be in him, to any part of said land, or any money arising or to arise from any sale or sales thereof; and in like manner to transfer, assign, and make over all such rights to said complainants.

That the said William Chiles do also account to and with the complainants, for any money he may at any time *have* received from any person or persons, on or by virtue of the sale of any part or parts thereof; also that he account to and with the complainants for any rents or profits which he may have enjoyed or

received in or from said land embraced in the patent to Hoy, under the direction of said court.

That a surveyor, to be appointed by said court, do, under their directions, ascertain the quantity of land claimed by the several defendants in this suit, (except William Chiles,) on the western side of the survey in Searcy's right, designated on the plat of the surveyor, dated 2d October 1831, by the letters A, D, T, U, J, K, M, E, and A; excluding therefrom all the lands within the lines of Flournoy's patent, and return a plat thereof to said court.

That the bill of the complainants be dismissed, as to all the land claimed by any defendant, east of the lines on said plat, designated by letters E, M, K, J, U, T; that their bill be dismissed, as to all the land purchased by Nicholas Smith from Jones, lying within the line of Flournoy's patent, marked on the surveyor's plat, in page 66 of the printed record, by the letters L, M, N, O.

That possession be awarded to the complainants, by the several defendants, of the land claimed or held by them, respectively, within the lines first herein referred to, as marked in the plat, dated 2d October 1831, and without Flournoy's line, which has not been purchased from or held under South or Chiles, or by any person or persons claiming or holding under them, or either of them, in virtue of any contract or agreement with them or either, by or under whose right, claim, or possession any of said defendants claim or hold any part or parts of said land.

That the surveyor, so to be appointed, do and shall ascertain the quantity of land, now claimed or held by any of the defendants, mediately or immediately, by, from, through, or under South or Chiles, or in virtue of any right asserted or claimed by them, or either, as aforesaid ; designating especially the quantity claimed or held by each defendant, or each class of claimants, under any one person, accordingly as they may hold or claim in severalty, or in common between themselves ; and return separate plats thereof to said circuit court. Whereupon, such of the complainants as are under no legal disability, shall, within such time as the said court shall direct, make, execute, and in due

[Boone v. Chiles.]

form of law acknowledge and deliver to the said defendants respectively, deeds of general warranty in fee, for the land described in such plats, on said defendants complying with this decree, as hereinafter mentioned : and that such of the complainants as may at such time be under any legal disability to make such deeds, shall, within six months from the removal of such disability, make, execute, acknowledge, and deliver such deeds to the defendants, their heirs, and assigns; or that the said circuit court, as so authorized by law, may order and direct that such deed or deeds shall be made by such commissioner, as they may appoint to execute the same for and on behalf of the complainants last mentioned.

That the said defendants severally, or each class thereof as aforesaid for themselves jointly, as they may claim or hold, do pay to the complainants for the land conveyed by them, at the rate and on the terms stated in the joint answer of the defendants, to wit, ten dollars for each and every of the four hundred acres purchased by Peter Smeltzer, and the two hundred acres purchased by Nicholas Smith from John South; to be paid in three equal annual instalments, counting from the agreement with Chiles, assumed to be 1st December 1817.

That the heirs of Nicholas Smith, or the defendants who claim or hold under him or his heirs, do pay to the complainants at the same rate, and on the same terms, for the sixty or seventy acres afterwards purchased by said Smith from South ; which said complainants shall convey as aforesaid to the defendant or defendants in possession thereof under Nicholas Smith.

That the amount so to be paid by each defendant, or class of defendants, bear interest from the time the instalments were payable respectively, till the time directed by the circuit court, at which the complainants are to make the deeds as aforesaid; each defendant or class to be liable only for the sum due by themselves, and not for any sum due by other defendants.

That, when the said deeds shall be executed and delivered, the sum due by each defendant or class, principal and interest, shall be paid as follows: one-third whereof to be paid in one year from the delivery of the deed, one-third in two years, and

one-third in three years, with interest from the time they are payable.

That the several sums so payable be paid into said court, or to such person or persons as said court by their decree shall order and direct; and on such terms and conditions as to them shall seem just and equitable.

That the defendants severally and respectively do, under the direction of said court, account to and with each other for any moneys received by one from the other, or any person or persons under whom they claim or have claimed, for or on account of any purchase-money of any part or parts of the land, now or at any time held or claimed by them or any of them, under or in virtue of any purchase under the title of Searcy.

That such of the heirs of William Hoy as have answered the bill of complainants, do convey to them, in the manner directed in the decree of the circuit court as to Jones and Fanny Hoy, all their right, title, and interest in the land contained within the line of the plat first herein referred to, being the western part of the survey aforesaid, in right of Searcy. In default of making such conveyance, as is herein directed to be made, by any of the defendants in this case; then this court doth further order and direct, that a conveyance of the right and title, interest and claim, in and to the land in controversy, held or claimed by such defendants; be conveyed to the complainants, by a commissioner, to be by the said circuit court appointed to make such conveyance according to law.

That the bill of complainants be dismissed, as to the heirs of George Boone, Hezekiah Boone, and the heirs of South, with costs.

And it is further ordered, adjudged, and decreed, that all the equity of the complainants, as to any person or persons not parties to this suit, or as to any matter or thing, not herein decreed on, shall be and is hereby reserved to the said complainants, any thing contained in this decree notwithstanding; and that this cause be remanded to the circuit court for the district of Kentucky, with instructions to proceed therein according to this decree, and as to justice and equity shall appertain

Mr. Justice McLean : Under the peculiar circumstances of this case, I am constrained to state, as succinctly as I can, the reasons why I dissent from the opinion just delivered.

The facts out of which this controversy arose, are as follows : Reuben Searcy being entitled to a settlement and pre-emption of fourteen hundred acres of land, in the settlement of Kentucky, on the waters of Licking, employed John Martin for one-half the land to perfect the title. On the 24th September 1781, for a valuable consideration, Searcy sold seven hundred acres of this land to William Hoy ; executed his bond for a title ; and, at the same time, assigned to Hoy the plat and certificate of survey, which enabled him, in 1785, *to obtain a patent for the whole tract in his own name.*

But before the emanation of the patent, in the month of December 1781, William Hoy assigned Searcy's bond to George Boone, and bound himself, his heirs, &c., as sureties, &c. And on the 30th April 1783, George Boone assigned the bond to Thomas Boone, whose heirs prosecute this suit.

Thomas Boone, being a citizen of Pennsylvania, gave a power of attorney to George Boone, of Kentucky, dated 1st October 1787, which authorized him, in the name of Thomas Boone, and for his use, "to ask, demand, sue for, and recover of and from Major William Hoy, of Kentucky settlement, a deed or other lawful conveyance valid in law, for seven hundred acres of land in or near the waters of Hinkson and Stoner, &c. ; and the attorney was authorized to appoint, &c., and to do every thing necessary in the premises," &c.

On the 6th August 1792, George Boone, as the attorney in fact of Thomas Boone, assigned Searcy's bond to John South, the executor of William Hoy, who bound himself to cause Hoy's heirs to convey, so soon as they should become of age, the seven hundred acres to Boone, &c. But on the 23d December 1791, before this assignment, South sold four hundred acres of the land to Peter Smeltzer, and bound himself with Walter Carr and John Glover, in the penalty of a thousand pounds, to make a deed for the same, so soon as the heirs of William Hoy, who was then deceased, should become of age. And on the 26th

August 1794, South sold two hundred acres of the same tract to George Pope, and bound himself in the penalty of five hundred pounds, to make a deed when Hoy's heirs should all arrive at full age. This last bond, in the spring of 1798, was purchased by, and assigned to Nicholas Smith, who shortly afterwards purchased from South the residue of the tract, supposed to contain sixty or seventy acres.

On the 30th November 1802, Thomas Boone made an agreement with his uncle, Hezekiah Boone, of the state of Tennessee, to sell to him the whole of this tract of land, for seven hundred pounds. But Hezekiah Boone and his heirs had the option of taking the land or not, within four years from the time of the contract; and the contract was to be binding if he should make known his determination to take the land and pay for it within the four years. But there is no evidence that Hezekiah Boone made known his determination, within the time limited, to take the land; or that he has, at any time, paid the whole or any part of the consideration.

On the 30th October 1817, Hezekiah Boone, and George Boone as attorney for Thomas, entered into an agreement with William Chiles, and delivered to him the papers they held respecting the above land; and Chiles was to have the free use of them, for the purpose of coercing the title to the land, if it could be recovered; and if not, he was to obtain the value. And Chiles was to use diligence in recovering the money or obtaining the title; and the proceeds of the suit, whether land or money, were to be divided between Chiles and Hezekiah Boone.

Shortly after this contract was entered into, Chiles, having obtained from George Boone the bond given him by South, which bound him to convey the land to Thomas Boone; so soon as Hoy's heirs could be compelled to make a deed; called on Peter Smeltzer's heirs, who held the bond of South, Carr, and Glover, and representing to them that he was the rightful owner of the land, obtained the bond; and, also, he obtained the bond for the two hundred acres given by South to Pope, and by him assigned to Smith; which bonds he delivered to Benjamin South, the executor of John South, who was deceased; together

with the bond given to George Boone, by the deceased; and obtained from the executor, possession of Searcy's bond and the assignments. The assignment of George Boone, as the attorney of Thomas, was then erased; and the contract between South and the tenants was cancelled. And the purchasers under South, purchased the land from Chiles, and bound themselves to pay for it ten dollars per acre.

At the August term of the Bourbon circuit court, in the year eighteen hundred and eighteen, Chiles brought an action of ejectment, in the name of Hoy's heirs, to recover possession of the land. The tenants having been served with notice, appeared and defended the suit; but a verdict was found against them, and a judgment was entered on the verdict.

On the 26th January 1818, Chiles filed a bill in the Bourbon circuit court in the name of himself, Hezekiah Boone, George Boone, and Thomas Boone, against the heirs of Hoy for a title. In this bill, Chiles stated that William Hoy and John Sappington, and Parthenia his wife, late Parthenia Hoy, had conveyed their interest to him. And he sets up the contract with Hezekiah Boone, as the ground for a decree in his favor, under Searcy's bond, and the assignments made thereon. The assignment by George Boone to South, is represented as inoperative and void; as George Boone had no power, as the attorney of Thomas Boone, to sell or transfer the title to the land. The heirs of Hoy and others, who were made defendants, answered the bill. And afterwards, at August term 1821, the court decreed that the complainant, William Chiles, was entitled to a specific execution of the contract from Hoy's heirs; and that, if the defendants did not execute a conveyance in pursuance of the decree, on or before a time specified, then, that Thomas P. Smith, as commissioner, under the statute of Kentucky, should execute it. And afterwards, on the 7th January 1822, the heirs of Hoy not having executed a conveyance for the land, in pursuance of the decree, the deed was executed in due form by the commissioner.

In April 1827, this decree of the Bourbon circuit court, was brought before the court of appeals of Kentucky, and reversed,

for want of proper parties; and the cause was remanded to the circuit court for further proceedings.

The heirs of Thomas Boone filed their bill in the circuit court of the United States on the 25th January 1823, at first against Chiles, Hezekiah Boone, George Boone, and the tenants who occupied the land; and represented that the bill filed by Chiles, in the name of Thomas Boone and others, against the heirs of Hoy, was a fraudulent proceeding; and as Chiles, under the decree, was supposed to be invested with the legal title, a decree for the title was prayed against him. And after the reversal of the decree of Bourbon circuit court, such of the heirs of Hoy, as were found within the jurisdiction of the court, were made parties.

The tenants answered and relied upon lapse of time, their purchase under South, and the fraud of Chiles, in their defence. Chiles also filed his answer, setting up his title, and also Fanny Hoy, and Jones Hoy, the only heirs of Hoy who were made parties to the bill, who admitted the right of the complainants. The material parts of the answers will be noticed, more particularly, under the appropriate points which arise for consideration.

There seems to be no question as to the genuineness of Searcy's bond, and the assignments made upon it; but it is insisted that Searcy should have been made a party.

The bill asks no decree against Searcy. By the assignment of the plot and certificate, he enabled William Hoy to obtain the patent in his own name; and this was equivalent to a conveyance of the land, in discharge of the bond. Hoy, therefore, could have no demand upon Searcy, and of course the assignee of Hoy could have none against him. He was, therefore, not a necessary party. The complainants, under the assignment of Hoy, pray a divestiture of the title from his heirs; and as between these parties, there can be no doubt of the equity of the complainants. Indeed, the heirs of Hoy do not controvert the right of the complainants.

In the argument, it was insisted, that the seven hundred acres claimed by the complainants, are not so specifically described in

the bill, as to enable the court to decree, in pursuance of the prayer, a specific conveyance.

William Hoy obtained in his own name a patent for the fourteen hundred acres; and it appears there is a surplus of more than five hundred acres. The bond of Searcy to Hoy was for seven hundred acres, and Hoy was to take his first choice out of the whole tract; and it appears that there does not remain of the entire tract, undisposed of, or not covered by paramount claims, more than will satisfy the above bond. And in addition to this consideration, the heirs of Hoy may be safely decreed to convey an undivided interest in the land, to the extent of the complainants' rights: and, if necessary, the complainants, under such a decree, being tenants in common with the heirs of Hoy, or those who hold an interest in the land, could have partition made. There is no want of certainty as to the identity of the entire tract.

As to the claim of Chiles, except under the deed of Newland and wife, I admit that it cannot be sustained. Hezekiah Boone, who sold to Chiles, had no interest to transfer. His contract with Thomas Boone was a conditional one, and the conditions were not performed. No part of the consideration was ever paid, nor did Hezekiah Boone signify his determination to take the land within the four years limited; and failing to do this, the contract upon its face was not to be binding.

The assent which George Boone, as attorney in fact for Thomas Boone, gave to the contract, made between Chiles and Hezekiah Boone, was an extraordinary procedure on his part. And it is sufficient to say, that he had no power to sell the land, much less to consent that Chiles and Hezekiah Boone should divide between them the land or the money, whichever should be recovered. George Boone, as the attorney of Thomas, had power to authorize Chiles to act as attorney or agent in endeavoring to recover the land; but he had no power to dispose of it in any manner.

As Chiles, by virtue of his contract with Hezekiah Boone, obtained conveyances of the interest of William Hoy and Parthenia Sappington, wife of John Sappington, two of the heirs of Hoy,

[Boone v. Chiles.]

he must, under the circumstances, be considered as holding the land in trust for those who have the better equity. In no sense can Chiles be considered as a purchaser of this interest, without notice and for a valuable consideration. But the interest of Newland and wife, which was conveyed to him through Green Clay, rests upon different principles. In my opinion, Chiles must hold this interest as a purchaser from Clay, who was a purchaser from Newland and wife, without notice of the complainant's equity.

A majority of the judges reject the right asserted under this deed, because the allegation that Clay was a purchaser for a valuable consideration and without notice, is not made with the requisite proceedings in the pleadings, to admit proof of the fact; and, also, because the deed to Green Clay conveys to him no title.

And, first: as to the allegations contained in the pleadings. In his answer to the complainant's bill, Chiles states that, "he admits a certain Green Clay bought and received the title of John Newland and wife; and discovering this to be the fact, he caused the said Green Clay to be made a party to the bill in the Bourbon circuit court, charging him to be a guilty purchaser, knowing of the equity arising from the bond of Hoy. But said Clay put in his answer denying notice; and this defendant not knowing evidence to prove notice, bought of him his share and paid him therefor, and received his conveyance. This defendant refers to the answer of Clay in the Bourbon circuit court, as part of this answer; and this defendant insists that Clay was an innocent purchaser for a valuable consideration, without notice, till his purchase was complete."

The answer of Clay in the Bourbon circuit court, and which is referred to by Chiles, and made a part of his answer, is as follows: " This respondent further saith, that it is not true, that to increase the difficulties of the complainant (Chiles,) as charged in said bill, John Newland and wife conveyed their interest, to the lands in controversy to this defendant, &c.; but, on the contrary, this respondent avers that the contract he made with John Newland and Celia his wife, was a bona fide contract, in good faith, for a valuable consideration paid them, without notice,

[Boone v. Chiles.]

or even a knowledge that the complainant, Chiles, had, or any of the other complainants, any claim on said land ; but, on the contrary, this defendant has been informed, and believes, verily, that the claim of the complainant Chiles, is founded in fraud and imposition," &c.; and " as to the contract between this respondent and John Newland and wife, it is committed to record and will speak for itself; and this respondent believes the complainant Chiles has misrepresented the true meaning thereof."

Although the averments in the bill, filed by Chiles on this point, in the Bourbon circuit court, and the answer of Newland and wife, in the present case, have no connexion with the answer of Chiles under consideration ; yet I will refer to them, as they have been thought to have some influence in the case.   In his original bill filed against Clay and others, in the Bourbon circuit court, Chiles alleges, that, " to increase the difficulty, the said John Newland and Celia his wife have conveyed their interest in said tract, with others, to a certain Green Clay, who your orators charge had full knowledge of your orators' claim ; and, as they are informed and believe, executed a contract with said Newland and wife when he received their conveyance, binding himself to make good all the contracts of their ancestor ; but yet the said Green Clay refuses to convey to your orator, William Chiles."

And Newland and wife answer to the bill in the present case, " that Celia is a daughter of Hoy, and that if ever they had an interest in the land mentioned in the said bills, and now in contest herein, that they have long since transferred their interest therein by a writing amounting to a quit claim, to Green Clay ; but they never conveyed the title, by deed, to him or any one else."

The answer of Newland and wife cannot be read in evidence against Chiles, a co-defendant.   If this answer, in every respect, were in accordance with the most technical forms, it could not aid a defective averment in the answer of Chiles ; nor can its defects, in any respect, have an unfavorable bearing on that answer.   It must rest upon its own language, equally unaffected

[Boone v. Chiles.]

by the answer of Newland and wife, and the original bill filed by Chiles in the Bourbon circuit court.

As it regards the sufficiency of the answer of Chiles to protect himself under the title of Clay, who is alleged to be an innocent purchaser for a valuable consideration, and without notice; it may be remarked, that no exceptions were taken to the answer; but a general replication was filed, or considered as filed.

In the case of Harris v. Ingleden, 3 Pier Williams 95, it is said that, "notice and fraud must also be denied generally, by way of averment in the plea, otherwise the fact of notice or of fraud will not be in issue. That, where a defendant, in his plea of a purchase for a valuable consideration, omits to deny notice, if the plaintiff replies to it, all the defendant has to do is to prove his purchase; and it is not material if the plaintiff proves notice; for it was the plaintiff's own fault that he did not set down the plea to be argued, in which case it would have been overruled."

But, independent of this consideration, what will constitute a good plea, by Chiles, to protect this purchase under Clay?

It must appear that the persons who made the conveyance to Green Clay, were seised of the land; that they conveyed by deed to him, and for a valuable consideration, which was paid and the deed executed, before notice of the complainant's equity. Mit. Pleadings 275; Hinde 180; 3 P. Williams 281; 1 Vern. 179.

Are not these facts found substantially in the answer of Chiles? It sufficiently appears that Newland and wife were seised; for they are stated to be the heirs of Hoy, in part, to whom the land descended, or was devised. And Chiles avers. that " Clay was an innocent purchaser, for a valuable consideration, without notice, until his purchase was complete." His purchase could not be complete in the sense here expressed, until the consideration was paid, and the deed executed. If this be the clear meaning of the allegation, it must be held sufficient. But the averments in the answer of Green Clay, are made a part of the answer of Chiles.

It must be admitted that this answer of Clay is loosely drawn, and without much regard to the forms of pleading. But, although

Clay speaks of his contract with Newland and wife, it is clear that he refers to a deed of conveyance, as he states it has been recorded; and, to use his language, it will speak for itself. And he avers that his purchase from Newland and wife was bona fide for a valuable consideration, and without notice.

Now when these allegations are incorporated with those contained in the answer of Chiles; and the fact, that there was no exception to the answer, are considered; I am inclined to think that the allegations should be considered sufficient to protect the title asserted.    The amount of the consideration paid is not specifically stated, but the averment is general: that a valuable consideration was paid, and that before notice.

It must be admitted that the allegations in the answer of Chiles, in relation to this purchase, are not made with technical precision; and if exceptions had been taken to this part of the answer, they might have been sustained.    But the complainants having failed to except, ought not now to insist, and indeed cannot, on the same degree of strictness as to form, as if they had done so. If this were admitted, the defendant would be taken by surprise, and the ends of justice might be defeated.    To guard against this, the forms of pleading require exceptions to be taken to matters set up in the defendant's answer in bar of the plaintiff's right. If exceptions be waived, and an issue taken on the answer, the complainants cannot object to the matter in bar, on the ground of the insufficiency of the plea or answer.    If Clay was a purchaser without notice, Chiles may shelter himself under a deed from Clay.    The estate having been innocently and fairly acquired, and for a valuable consideration, can be conveyed to a person with notice.    1 Atk. 571, 2 Atk. 139, 242; 2 Eq. Cas. 685, 13 Ves. 120, Pre. in Cha. 51.    That a decree was loosely entered against Clay in the Bourbon court is of no importance, as that decree has been annulled.    If the objection as to the sufficiency of the answer of Chiles, under the circumstances, cannot now be insisted on by the complainants; it becomes important to examine the deed from Newland and wife to Green Clay, and to determine the effect of that conveyance.

I will transcribe the operative words of the deed.    " This in-

denture, made this 23d day of May, in the year 1814, between John Newland and Celia his wife, of the county of Madison, and state of Kentucky, of the one part; and Green Clay, of the same county and state aforesaid, of the other part, witnesseth : that the said John Newland and Celia his wife, for and in consideration of the sum of one hundred dollars, to them in hand paid, the receipt whereof, &c.; have granted, bargained, and sold ; and do, by these presents, grant, bargain, sell, and convey to the said Green Clay, his heirs and assigns forever, all the right, title, claim, and interest which they, the said John Newland and Celia his wife have in and to the real and personal estate of William Hoy, deceased ; and all debts, dues, and demands, rents and profits, either in law or equity, to which they are or shall be entitled, as one of the heirs and legatees of the said William Hoy, deceased ; she, the said Celia Newland, wife of the said John Newland, late Celia Hoy, being one of the children and legatees of the said William Hoy, deceased." To this, covenants of special warranty are added, and also of further assurances, &c.

Can any doubt exist that this deed conveys to Green Clay what it purported to convey to him, all the right and title, &c. of the grantors to the real estate of William Hoy, deceased. Celia Newland, under the will of her father, received a certain interest in her father's real estate, and this interest she conveyed by the above deed.

It is true that Newland and wife, under the will of William Hoy, could receive nothing more than the legal title, their ancestor having, in his life-time, sold and conveyed the equitable title. But, having the legal estate, does any one doubt that they could convey, and did convey to Green Clay, a clear title to the land, if he was a bona fide purchaser, without notice, and for a valuable consideration.

That Clay was a purchaser of this description is averred, and there are no facts in the case which disprove the averment ; and, in all such cases, the proof of notice or fraud rests with him at whose instance the title is impeached.

The deed of Newland and wife describes with sufficient certainty the interest conveyed. It was the interest which Celia

[Boone v. Chiles.]

Newland received under the will of her father. This conveyance, containing all the operative words necessary to convey an estate in fee, and also describing with the requisite certainty the interest conveyed, must be considered as an operative and valid conveyance in the hands of Clay; who, as before stated, was a purchaser without notice, and for a valuable consideration. I think, therefore, that Chiles, without reference to his knowledge of the facts or his conduct, should be considered as holding this interest against the equity asserted by the complainants.

The counsel for the complainants insisted, that, under the decree of the Bourbon circuit court, Chiles was invested with the legal estate in the land ; and that the legal title, under the deed of the commissioner, still remains in him, notwithstanding the reversal of the decree by the court of appeals.

The decree of reversal, by the court of appeals, does not require this deed to be cancelled ; nor, in my opinion, was it necessary to annul it. The deed of the commissioner is inseparably connected with the decree ; indeed, it is a part of the decree ; and must have the same effect as if the statute of the state had provided that a decree should operate as a conveyance.

In this respect the deed is different from a deed executed by a sheriff on a sale on execution, or perhaps a sale under a decree in chancery. A reversal of the judgment does not invalidate the sheriff's deed ; but a reversal of the decree must destroy the effect of the commissioner's deed ; as in no sense can he be considered as the agent of the party, but as an officer of the court, and as acting strictly under its authority. He does not, as a purchaser under an execution, pay money on the faith of the sale. The title passes by this deed ; but if the decree, which is the authority of the commissioner, be reversed, the deed must fall with it.

That this is the view taken of the commissioner's deed in Kentucky, is shown by the proceedings in all cases of reversal. The decree of Chiles was reversed, and the case was sent down to the Bourbon chancery court, with instructions to amend the bill, and to have further proceedings. And I presume the cause

[Boone v. Chiles.]

is still pending in that court, and Chiles is praying for a title for the lands embraced by the commissioner's deed.

In the case of Watts et al. v. Waddle et al. 6 Peters 400, the court say "the deed executed by the commissioner in this case, must be considered as forming a part of the proceedings in the court of chancery; and no greater effect can be given to it, than if the decree itself, by statute, was made to operate as a convey-ance in Kentucky, as it does in Ohio."

The right set up by the present occupants of the land, against that which is asserted by the complainants, is the next point for consideration. I shall examine this point with some minuteness. as I cannot assent to the decision made by my brother judges.

Smeltzer, it is proved, took possession of the four hundred acres he purchased from South in 1791; and he, or those claim-ing under him, have been in the possession ever since. And it is proved that Smith took possession of his purchase of two hun-dred acres in 1798, and the additional purchase of fifty acres shortly afterwards; and he, or those claiming under him, have held possession to this time. The first question that arises in this, and all similar inquiries is, whether the possession of the occupants was adverse to the title asserted by the complainants.

If the title of the tenants was not adverse, the statute of limita-tions cannot operate, nor can we, by analogy, apply the princi-ples of the statute in the case.

The title set up by these defendants is under South, who claimed under an assignment of Searcy's bond by George Boone, as the attorney of Thomas Boone, the ancestor of the com-plainants. This assignment by George Boone was not author-ized by the power of attorney under which he acted. That power authorized George Boone "to ask, demand, sue for, and recover, of and from William Hoy, a deed or other lawful con-veyance, valid in law," for the land; but he had no power to sell or convey the title. This act was void, as to Thomas Boone. In no respect could it prejudice his right; for South, taking the assignment, was bound to look to the authority under which it was made.

In the case of Hawkins, Witton et al. v. Page's heirs, 4 Bibb

138, the court of appeals say, "the only plausible objection that can be raised to these conclusions is, that the possession of twenty years, and upwards, would give a legal estate to the possessor under the equity, notwithstanding the legal title remained in another. This doctrine cannot be maintained. So long as the holder of the equity looked to the legal title-holder for the legal estate, he must be considered as holding under him ; and the length of possession enures to the benefit of the legal estate, as against adverse claimants, but did not give the legal estate to the equitable possessor ; as between these two, the legal title-holder and the equitable possessor, and by continuing under these circumstances, lapse of time could be no bar, and could not transfer the right of entry to the possessor." And in the case of Gay v. Maffitt, 2 Bibb 507, the court say, "where one claims under or through the other, there shall be no adverse possession in such case, sufficient to give a title." And again, in the same case, page 508, "if, therefore, we consider the appellant as having no other title than that derived from possession, and that his possession has been changed from an adverse, hostile, into a friendly, possession, it follows, that the statute of limitation does not apply to his case." And in 5 Littell 318, it is laid down, that "a holding of land under a bond from the patentee, cannot be considered as adverse thereto." Other decisions in Kentucky, to the same import, might be cited, but it is unnecessary. That the rule established in Kentucky must govern the question under consideration, is admitted ; although such rule be different from the general law on the subject.

It is, then, well settled in Kentucky, that a purchaser who enters under a contract, looking to the person in whom the fee is vested for the perfection of his title, does not hold adversely to the legal title.

The legal title to the land in controversy was in the heirs of Hoy ; of course the possession or title of the tenants could not be adverse to them. And is it not equally clear that, as the tenants set up a title under an assignment of Thomas Boone, and claim through him, their title is not adverse to his ; and consequently, their possession is not adverse. Their title, as asserted,

can be of no validity unless the equity of Thomas Boone, from Hoy, shall be established. They claim under and through Thomas Boone, and not in hostility to him. Their possession, therefore, so far as it rests upon a claim of title, is in no sense hostile to the legal interests of Hoy's heirs, nor the equitable interests of the heirs of Thomas Boone.

Under such circumstances, no length of time would enable the tenants, as against Hoy's heirs, to set up the statute of limitation. So fully is this rule established in Kentucky, that when Chiles prosecuted an action of ejectment in the name of Hoy's heirs, in the Bourbon circuit court, against the tenants, they did not rely on the statute.

I do not insist that the parties in this case are so situated that lapse of time can have no effect upon their rights; but it is clear that, on the part of the tenants, the statute of limitations cannot be set up as a bar in an action at law; and by consequence, it cannot be applied, by analogy, as a bar in equity. The rule of the statute, in chancery, is adopted on the ground that equity follows the law; and where the law fails, the rule in equity must also fail.

A court of chancery is said to act on its own rules, in regard to stale demands, and independent of the statute. It will refuse to give relief where a party has long slept upon his rights; and where the possession of the property claimed has been held in good faith, without disturbance, and has greatly increased in value. But in such a case, the court will give due weight to all the circumstances connected with the claim of title or possession, and the effect of the lapse of time may be obviated, by a great variety of facts and circumstances; which, however, would be unavailable to the complainants, where the statute would bar.

I will now examine the equity of the tenants in regard to the lapse of time.

It will be observed, that they set up a purchase under John South, the executor of William Hoy, in 1791, when South had no pretence or color of title to the land, except as having married one of the legatees of Hoy; and through her he could claim

[Boone v. Chiles.]

only a naked legal title, the equity having been transferred by Hoy in his lifetime.

And afterwards, in 1792, when South obtained the assignment of Searcy's bond, by George Boone, as the attorney of Thomas Boone, the assignment was inoperative for want of power in the attorney. This assignment, upon its face, would direct every person who claimed any interest under it, to the authority by which George Boone acted.

Had Smeltzer and Smith, the first purchasers, notice of this defect in the assignment to South?

In his deposition, Nicholas Smith says " that he bought a bond of John South, in 1798, for two hundred acres of land, out of the tract in controversy; and that, shortly after, he purchased from South the residue of the tract, supposed to be sixty or seventy acres, after satisfying Smeltzer's purchase of four hundred acres. And, at the same time, he lent South three hundred dollars, which sum was to go as payment for the land; and if that sum overrun, he was to pay back, and if it fell short, the witness was to pay the balance. He took possession of the land, and has ever since held it, under this purchase; but he afterwards found out that South had no right to sell the land, and brought suit against him, and recovered back the three hundred dollars."

The time that Smith ascertained that South had no right to sell the land does not appear; but the facts stated authorize the inference that this knowledge was acquired by Smith not long subsequent to the purchase. Some time before 1809, it appears South was very much embarrassed, and in that year was confined as a lunatic. The suit of Smith must have been brought before South's extreme embarrassment, as the money was recovered from him, and in all probability the money was repaid to Smith within five or, at most, six years of his purchase.

Barbara Smeltzer, the wife of Peter Smeltzer, who purchased the four hundred acre tract, states in her deposition, that her husband made the purchase of South, &c., who claimed the same under the bond from Reuben Searcy to William Hoy, and assigned by Hoy to George Boone; that, at the time they first settled, John South represented to her husband that he had traded

VOL. X.—2 G

tor the said bond, but that they afterwards found out he had not got the bond, but soon afterwards he obtained it from George Boone

John Walton, a witness, states that he acted as one of the commissioners to divide the land, agreeably to the will of Peter Smeltzer, deceased, about the year 1805 or 1806 ; and that there was conversation at that time, among the heirs of Smeltzer, about South and Hoy's bond," &c.

Joseph Steele, a witness, states that he was informed by George Boone, that Smeltzer had notice, before he purchased the land from South, that it belonged to Thomas Boone. This statement seems not to have been objected to in the circuit court.

James Robinson, a witness, being present when the deposition of Barbara Smeltzer was taken, was astonished to find that a person of her age should describe so accurately Searcy's bond to Hoy, as to its date, the land called for, &c.

Benjamin Mills, an attorney at law, who was sworn as a witness, states, in 1826, that many years before, Peter Smith, and either John or Jacob Smeltzer, and perhaps Nicholas Smith, applied to him to bring suit for the legal title of the land, and especially for that part described in the bond signed by South, Carr, and Glover ; but on examining the title, although the witness declines making some statements on account of professional confidence, yet he says, substantially, he considered the title wholly defective, under the assignment of South ; and, for that reason, declined bringing suit. As the witness left the bar for the bench, in 1818, and as he speaks of the bond of South, Carr, and Glover, which was given up in 1817 to Chiles ; this conversation must have been prior to that time, and, probably, was several years before it.

But in 1817, Smith, and the heirs of Smeltzer, surrendered to Chiles the bonds they held on South for the land, and bought the land of Chiles, agreeing to pay him for it ten dollars per acre.

Chiles having possession of the bonds of South, who was then deceased, rescinded the contract with his executor, gave up

South's bonds for the land, and received from the executor Searcy's bond, after the erasure of the assignment by George Boone, as the attorney of Thomas, to South.

Judge Mills, while at the bar, brought an action of ejectment in the name of Hoy's heirs, to recover possession of this land; but it was dismissed for want of prosecution. Afterwards, in the year 1817, he brought a second ejectment, which was served on the tenants; against whom a final judgment was obtained by the verdict of a jury, defence being made in 1818.

To open a judgment by default in this cause, Nicholas Smith and Jacob Smeltzer swore, that " they had no expectation that William Chiles would have prosecuted the suit to judgment against them, as they had purchased from him the title of Hoy's heirs for the sum of six thousand dollars, nine hundred dollars of which sum they had paid to him, and that the balance was not then due. They stated they held Chiles's bond to convey to them Hoy's, title, and that, when the compromise was made, the suit was not to be prosecuted, &c.

In 1820 or 1821, George W. Baylor purchased the interest of Peter Smeltzer's devisees in the tract of land in controversy ; and on the 25th of August 1821, received a conveyance for one third of the tract from Anna Maria Smeltzer and her husband. The consideration named in the deed is nine hundred dollars, and the grantors only convey their right, title, and interest, and warrant against themselves and all persons claiming under them. And for the residue of the tract, Baylor holds the bonds of John and Jacob Smeltzer; but what consideration was paid or contracted to be paid does not appear. George W. Baylor having died shortly after the commencement of this suit, it has been carried on against his heirs who are made parties. The heirs of Cummings, who are defendants, seem not to be entitled to any part of this land. It then appears that the heirs and assignees of Nicholas Smith, and the heirs of Baylor, are the tenants, and the only persons who rely upon the lapse of time and the length of possession to protect them in this case.

James Hutchins, a witness, swears that George W. Baylor took possession of the land in dispute some time in April, 1823.

That he does not remember whether he heard Baylor say any thing, particularly about Boone's claim, before he moved to the land. But, the witness states, after Boone Engles' return from Pennsylvania, in 1822, he heard him tell Baylor that he was authorized to investigate Boone's claim, and that he would have the land.

And William Burr, a witness, says: "before Engles went to Pennsylvania, he heard him and Baylor have some conversation about the claim of Thomas Boone to the land now in contest. The deponent has not a distinct recollection of what was said, but is under the impression Baylor spoke of an intention to purchase Smeltzer's land, and that Engles advised him not to do it, because the land belonged to Thomas Boone. He also thinks that Baylor and Engles had some conversation about forming a partnership in the investigation of Boone's claim." "He says, after Engles' return from Pennsylvania, and before Baylor had removed to the land, Engles and he had different conversations respecting Boone's title."

These are the leading facts on which the heirs of Baylor and Smith claim protection of a court of chancery from the lapse of time, and the equitable circumstances of the case.

In the first place, they claim under the same title as the complainants, and not in hostility to it.

South had no right under the assignment of George Boone; and there is no evidence that the purchase money was paid by Smeltzer or his heirs to South; and the amount paid by Nicholas Smith was sued for and recovered from South, after it was known that he had no title to the land. And this must have been within a very few years after the purchase of Smith, not exceeding ten years, and perhaps less than five.

That Smeltzer had notice of the want of title in South, is certain, from the depositions of his widow Barbara Smeltzer, and Joseph Steele. She states that, when South sold to them the land he had not the bond of Searcy, but that he afterwards obtained it. With accuracy she detailed the substance of the bond, its date, and the assignments. Smeltzer, therefore, as she states, was well acquainted with the fraud of South, in selling the land

[Boone v. Chiles.]

before he had a title, and this should have put Smeltzer on his guard.   He was, no doubt, as well acquainted with Searcy's bond as his wife, and the assignment of George Boone was evidence upon its face, that unless he acted under a power from Thomas Boone, the assignment was void.

An action of ejectment was commenced, in the name of Hoy's heirs, to recover possession of the land, which was afterwards discontinued.   And afterwards, in 1817, when Chiles, under his purchase of Hezekiah Boone, and having the sanction of George Boone, the attorney of Thomas Boone, to investigate the title, the tenants surrendered the bonds they had on South, although security was given in the one held by Smeltzer's heirs to Chiles, who cancelled the contract with South, and sold the land to the tenants.   It is true, this contract of Chiles is represented to have been obtained by fraud; but the payment made under it, and the use made of it to set aside a judgment by default in the eject-ment suit, show that they had wholly abandoned the claim of title under South.

And, as it regards Baylor's heirs, they were in possession only one or two years before the commencement of this suit; and their ancestor purchased nothing more than the right of Anna Maria Smeltzer, one of the legatees of Peter Smeltzer, with only a special warranty, and of John and Jacob Smeltzer, the other legatees of the land in dispute; and the inference is authorized, that the same interest, and no more, was to be conveyed under the title bonds, and this with a full knowledge of the complain-ant's equity, and of the total defect of title in the legatees.   Can a right thus acquired and asserted be protected by lapse of time? Does it come within that salutary rule, which has been adopted to preserve the peace of society, and protect rights long acquired and enjoyed without interruption, against stale demands?  Did not Baylor purchase the interests of Smeltzer's legatees on specula-tion?   Knowing the title of the legatees to be defective, or rather to have no foundation on which it could be sustained, did he not purchase it; and, under such circumstances, how can the lapse of time aid him?   If this principle might have been invoked by Smeltzer's legatees, is the same right transferred to Baylor, who

purchases the interest of the legatees, without a general warranty, and for a valuable consideration? This appears to me to have been a purchase that does not draw after it the equitable considerations which were connected with the title of Smeltzer's legatees; and if it did, I am not prepared, under the circumstances, to say that it is entitled to the protection of a court of chancery.

It appears to me that the purchase was made with more reference to the value of the improvements than the title of the tenants; and under the expectation that, if the land should be lost, compensation for the improvements would reimburse the purchase money.

And as it regards the title of those who claim under Nicholas Smith, it seems not to require a much more favorable consideration. The money proved to have been paid by Smith, on the purchase from South, was recovered back again; and the heirs abandoned the claim under South, and purchased from Chiles. He purchased fifty acres of Jones, which is covered by Flournoy's patent; and he is protected, under the statute of limitations, to this extent.

I have looked through the cases decided in this country and in England, and I can find no instance where lapse of time, under circumstances analogous to those which belong to this case, has been held sufficient to protect the possession against a clear equitable title.

The presumptions in favor of the tenants, which might arise from lapse of time, are repelled by the facts and circumstances of the case. These must always be regarded as controlling mere lapse of time; and they are such, in this case, as to convince me that to protect the rights set up by the tenants would sanction a new rule, and one that would be dangerous to bona fide claimants. I am, therefore, of the opinion that time, which cures many imperfections in a meritorious title, and often authorizes the presumption of title where none, in fact, exists; cannot protect the tenants in this case.

That the complainants should be decreed to release their interest to the tenants, under the contract they made with Chiles, is, to me, a most extraordinary result of the controversy. I can-

not give my sanction to the principles on which it rests. If the decree enforces this contract, then must lapse of time be abandoned; for the contract bears date only five or six years before this suit was instituted : and on what principles such a decree can be made, in the relation which the parties bear to each other in the suit, and in the present state of the pleadings, I am unable to comprehend.

This contract is declared by the tenants to be fraudulent; and they have refused, by their whole proceedings in this suit, to be bound by it. They have invoked the aid of a court of chancery to annul and set aside this contract; and, I believe, have taken steps to recover back from Chiles the money they had paid him on it.

But this contract is not only declared by the tenants to be fraudulent and void: the complainants also denounce it as fraudulent. It finds favor in the eyes of no one but Chiles. And yet, this contract, thus treated by the complainants and defendants, and made by Chiles without a color of right, is made the basis of a decree of this court, which takes from the complainants, and gives to the defendants, a large estate. Chiles, though the fraudulent instrument in making this contract, is not permitted to enjoy any advantages under it.

If the complainants had adopted this contract; if they, in any manner, had sanctioned the contract, by treating Chiles as their agent in selling the land ; there would be some ground to decree a specific execution of it. But the complainants have not sanctioned the conduct of Chiles in making this contract; and so far from seeking any thing under it, have declared it to be fraudulent and void : and yet, in despite of them, it is made the rule by which their rights are decided. I am altogether opposed to the decree on this ground.

As the decree of the circuit court is reversed, it cannot be necessary to say any thing respecting the decree which was made respecting the rents and profits. It will be found, however, that Hoy had eight heirs; two of whom, Fanny Hoy and Jones Hoy, were defendants in the suit; and that Chiles had received conveyances from two of the heirs, besides Newland and

wife. And as Chiles was decreed to convey his interest, and the two heirs of Hoy, who were defendants, were decreed to convey, also, under this decree; the complainants became vested with four-eighths of the land, and he was made accountable to pay for that proportion of the improvements, and in the same proportion was held entitled to the rents.

Elizabeth South, whose deed is in the record, is not a party to the suit, and the court could not act on her interest.